OPINION OF THE COURT
Anthony J. Sciolino, J.
In these two cases, involving two children each, the court was presented with petitions for second parent adoptions by the lesbian life partners of biological mothers. The court granted the adoptions and indicated that because of the novelty of this type of adoption request, a written decision would issue.
In both adoption No. 1 and adoption No. 2, the couples have lived together in committed, long-term relationships for 9 and 12 years respectively. Each couple viewed its relationship as permanent, akin to marriage. Both sets of partners jointly decided to develop families and to that end the subject children were conceived through artificial insemination.
The children in adoption No. 1 are Emily, born June 27, 1988, and Caitlin, born March 6, 1993. Emily was conceived from the sperm of an anonymous donor, under the auspices of the Sperm Donor Program and Assisted Fertility Program of Strong Memorial Hospital, Rochester, New York. Caitlin, was similarly conceived, but her sperm donor, who has been promised anonymity, is known to the couple. The children’s last name is that of their biological mother.
The children in adoption No. 2 are Adam, born November 29, 1990, and Katy, born June 16, 1992. Both were conceived from the sperm of the same anonymous donor under the auspices of the University of Rochester Medical Center Andrology Lab. The children’s last name is that of the petitioning adoptive mother.
The court appointed Law Guardians for the children in each case to advocate on their behalf. The court reviewed the Law Guardians’ reports and recommendations and the homestudies of both households prepared by Miriam A. Richardson, M.S.W., which included letters of reference submitted by friends of the parties. Everyone expressing an opinion strongly recommended in favor of granting the adoptions in the best interests of the children.
*1001 In adoption No. 1, petitioning adoptive mother (M.E.F.), age 40, was graduated from the University of Notre Dame in 1975, with a Bachelor of Science degree in Biology. In 1976, she earned a Master’s degree in Engineering, with a concentration in Environmental Health. She is currently employed as an Environmental Engineer and provides the primary financial support to the family. Biological mother (P.B.), age 41, is not employed. M.E.F. and P.B. have known each other for 15 years and have lived together for 9 years. All of their possessions are in joint ownership and each has a warm relationship with her nuclear family, visiting with them often. The family lives in a large two-story 100-year-old house in excellent repair, in a quiet neighborhood on a tree-lined street populated with young families. The homestudy concludes:
"P.B. and M.E.F. are two intelligent, stable, mature women who have been thoughtful and who have carefully considered their relationship and how they can be the best kind of parents for the two children.
"Both are excellent parents, with fine values, spiritually, culturally, educationally and emotionally. M.E.F. is a practicing Catholic and she has been highly recommended by her pastor.
"Both women understand that there will be questions they will have to deal with when the children become knowledgeable about the family lifestyle. It is my belief that they will deal with these concerns in a loving and honest manner.
"M.E.F.’s wish to adopt the children and parent them along with P.B. is a courageous and well-thought-through desire and I feel she will add much security and love to the children’s lives. I strongly recommend this adoption.” (B-F Homestudy, at 7.)
In adoption No. 2, petitioning adoptive mother (F.M.W.), age 41, earned a Bachelor of Science degree in Laboratory Technology from the University of Oklahoma in 1974. She and biological mother (S.M.), age 37, both work for a large local corporation where they met in 1977. They have lived together since 1981, a period of 12 years. The family lives in a nearby suburb in a neat and well-furnished raised ranch. F.M.W. is the primary wage earner of the family as is the adoptive mother in adoption No. 1. The homestudy concludes:
"F.M.W. is an intelligent, loving person, who has much to offer these children in the way of psychological, educational, cultural and spiritual needs. She and S.M. both are excellent *1002 role models for stability and academic motivation. They themselves have a stable and devoted relationship and I strongly recommend this adoption.
"Both have already proven themselves to be knowledgeable about parenting and the needs of these children. F.(M.W.) has been with these children since birth.” (W-M Homestudy, at 7.)
Pursuant to Domestic Relations Law § 110 "An adult unmarried person or an adult husband and his adult wife together may adopt another person.” The petitioners here are unmarried persons seeking to adopt the biological children of their lesbian life partners.
The consent requirements for an adoption as set forth in Domestic Relations Law § 111 were met in these cases, as the children’s unwed biological mothers have consented and their biological fathers’ rights were waived pursuant to written agreements executed at the time of the biological mothers’ artificial insemination. None of the children are over the age of 14 years, so their formal consent was not required.
No provision of New York law requires that an adoptive parent be of any particular gender. Moreover, discrimination based upon sexual preference is specifically proscribed. (18 NYCRR 421.16 [h] [2].) Pursuant to Domestic Relations Law § 114, decisions are to be made solely in the "best interests” of the adoptive children. Laws in most States, including New York, do not address the issue of same sex adoptions. Only two States, Florida and New Hampshire, specifically prohibit them. Lower courts in 12 States, including at least one other in New York, have approved these types of adoptions.
In New York a parent’s sexual orientation may be considered in resolving custody cases only if some adverse impact is proven to the children’s welfare. (See, Guinan v Guinan, 102 AD2d 963 [3d Dept 1984]; Di Stefano v Di Stefano, 60 AD2d 976 [4th Dept 1978].)
Domestic Relations Law § 117 (1) (a) provides that: "the natural parents of the adoptive child shall be relieved of all parental duties toward and of all responsibilities for and shall have no rights over such adoptive child”.
A strict interpretation of Domestic Relations Law § 117 (1) in these cases would require the termination of the parental rights of the children’s biological mothers.
Although the court may not rewrite a statute, it can interpret it to give a proper meaning consistent with the legislative intent. Courts have given "directory”, rather than mandatory, *1003 construction to literal language in statutes. Broad interpretation of legislative intent herein supports interpretation allowing these adoptions. This issue, as previously noted, has been addressed by lower courts in New York and elsewhere, and by the highest court of Vermont (see, for example, Matter of Adoption of T. & M., DC Super Ct, Fam Div, Aug. 30, 1991, 17 Fam L Rptr [BNA] 1523, citing 2A, Sutherland, Statutory Construction § 57.03, at 644 [4th ed 1984]).
In Matter of Evan (153 Misc 2d 844 [Sur Ct, NY County 1992]), the first reported same sex adoption case in New York, the petitioners were two women, one of whom was the biological mother of a six-year-old boy. The petitioners had together raised the child, the result of artificial insemination, since his birth. The child accepted the fact that he had two mothers and had a loving relationship with each.
The court in Matter of Evan (supra) held that adoption was in the best interests of the child. Judge Preminger considered the effect of Domestic Relations Law § 117 (1) (a), but ignored its restrictive language to avoid an "absurd outcome” (i.e., termination of the biological mother’s rights) which would nullify the advantage sought by the proposed adoption, namely, the creation of a legal family unit identical to the actual family setup. To avoid this "strict construction” interpretation, the court cited cases, including Matter of A. J. J. (108 Misc 2d 657 [Sur Ct, NY County 1981]). The court also relied upon its "equitable power” to continue the rights of the biological mother.
In Matter of A. J. J. (supra), the court permitted the biological father to adopt an out-of-wedlock child without terminating the biological mother’s rights. Both parents, who refused to marry, favored the adoption to remove the stigma of illegitimacy and to permit the child to inherit from the father’s ancestors, as a trust benefitted adopted descendants but not illegitimate descendants.
The court in Matter of A. J. J. (supra) allowed the adoption as if the petitioning father were the stepfather, when, in fact, the petitioning father and mother refused to marry and did not even live together. The court also relied upon its equitable power to confer back to the consenting mother custodial rights and responsibilities, citing SCPA 201 (n.b., Family Court has original jurisdiction concurrent with Surrogate’s Courts over adoption proceedings. [See, Family Ct Act § 641]).
A recent decision of the Supreme Court of Vermont decided *1004 the issue whether Vermont law requires the termination of the biological mother’s parental rights if her children are adopted by a person to whom she is not married. That court held that "where the family unit is comprised of the natural mother and her partner, and the adoption is in the best interests of the children, terminating the natural mother’s rights is unreasonable and unnecessary.” (Adoptions of B.L.V.B. & E.L.V.B., 160 Vt 368, 628 A2d 1271 [1993].) In Vermont, the adoption statute is similar to that of New York. The lower court had strictly construed that statute to require that if a couple adopts together, they must be married and if one is the birth parent, and the other desires to adopt, the couple must be married (the so-called "stepparent exception”). The highest court of Vermont, however, disagreed, citing Matter of Evan (153 Misc 2d 844, supra), and held that enforcing the termination of the birth mother’s rights would be an "absurd result” and would result in a situation inconsistent with the best interests of the children and the public policy of the State (of Vermont).
The Vermont court concluded that it was highly unlikely the Vermont Legislature considered adoption by same sex partners when the section of law was enacted in 1947, or amended in 1963. Because such adoptions were apparently not contemplated when the section was drafted, the court stated that it cannot be said they were either specifically prohibited or allowed. The policy behind the stepparent exception was expressed as being against common sense to terminate the biological parent’s rights when the parent will continue to raise and be responsible for the child, albeit in a family unit with a partner who is biologically unrelated to the child. Clearly, the highest court of Vermont believed that the intention of the Legislature was to protect the security of the family unit.
Although no other State Supreme Court had confronted the issue, the Vermont Supreme Court cited lower court decisions in the District of Columbia, New Jersey and New York (Matter of Evan, supra; Matter of A. J. J., supra), in support of its conclusion to allow same sex adoptions to come within the stepparent exception.
In New York, the so-called stepparent exception is set forth in Domestic Relations Law § 117 (1) (d) which states, in pertinent part, that when the parent consents that the stepparent may adopt, "such consent shall not relieve the parent so consenting of any parental duty toward such child”.
*1005 Although Domestic Relations Law § 117 (1) (d) explicitly addresses stepparent adoptions and excepts those situations as in the Vermont statute, it does not explicitly address the situation presented in same sex adoption cases, which is analogous to a stepparent adoption insofar as the biological mother’s position is concerned.
Another approach is suggested by In re Adoption of A.O.L. (Alaska Super Ct, July 23, 1985, No. 1JU-85-25-P/A), cited in Polikoff, This Child Does Have Two Mothers: Redefining Parenthood To Meet The Needs Of Children In Lesbian-Mother And Other Nontraditional Families (78 Geo LJ 459, 522 [1990]). In that case, the court accepted the argument that all parties to an adoption proceeding could waive a statute which appeared to require the termination of the biological parent’s rights.
The issue before this court in adoptions Nos. 1 and 2 was not whether, in the abstract, it is in the best interests of children to have two mothers, as opposed to a single mother or a mother and a father. The issue rather was whether, given the realities of the relationships between the children and the petitioners and between the petitioners and the biological mothers, would the children herein be better or worse off if the adoptions were approved? Furthermore, as the Vermont Supreme Court pointed out: "We are not called upon to approve or disapprove of the relationship between the appellants. Whether we do or not, the fact remains that Deborah has acted as a parent of B.L.V.B. and E.L.V.B. from the moment they were born. To deny legal protection of their relationship, as a matter of law, is inconsistent with the children’s best interest and therefore with the public policy of this state.” (Adoptions of B.L.V.B. & E.L.V.B, 160 Vt, at 376, 628 A2d, at 1276, supra.)
The public policy of New York similarly supports an analysis of the relationships of the petitioners and the children herein consistent with the children’s best interests. The court, in approving adoption No. 1 and adoption No. 2, concluded that to deny legal protection, as a matter of law, would clearly be inconsistent with the children’s best interests and, therefore, termination of biological mothers’ rights was not required.
Approving these adoptions made no change in the day-today living arrangements of the children, as the status quo would have continued in each case irrespective of the court’s *1006 decision. However, the children, after adoption, were clearly better off than before because by reason of adoption they acquired certain legally enforceable rights, including the right to: support (Domestic Relations Law §§ 236, 240); inheritance (EPTL 2-1.3, 4-1.1); Social Security benefits in the event of disability or death (42 USC § 402 [d]); and medical, educational and other benefits available through employment. It should be noted that petitioning adoptive mothers herein were the primary wage earners in each family.
An additional right the children acquired through adoption was the right of parental visitation in the event of separation. This issue is important in light of the Court of Appeals decision in Matter of Alison D. v Virginia M. (77 NY2d 651 [1991]), wherein the majority held, over the strong dissent of Judge Kaye, that a woman who had a six-year relationship with the child’s biological mother and had jointly cared for and made decisions about the child who was 28 months old when the parties terminated their relationship had no legal standing to seek visitation with the child under section 70 of the Domestic Relations Law.
An objection to these adoptions could be made if it could be shown that upbringing by same sex parents negatively impacted the children involved. A number of studies have been done to establish the effects on a child of living in a home with homosexual parents. Without exception, these studies evidence that children living with gay or lesbian parents suffer no apparent disadvantage.
Perhaps the greatest concern voiced about such children is that they will grow up to be homosexual. This assumption, however, is similarly disproved by reported studies.
Every study on the subject has revealed that the incidence of same sex orientation among the children of gays and lesbians occurs as randomly and in the same proportion as it does among children in the general population. Therefore, despite the concern of many courts about the negative influence on a child, sexual orientation, according to several studies, is developed independently of one’s parents and the concern of Judges that a homosexual parent will rear homosexual children is unwarranted by the evidence. (Sexual Orientation: Should it Affect Child Custody Rulings, 16 Law and Psychol Rev 189 [1992].)
A report that reviewed available research, referenced in Matter of Evan (153 Misc 2d 844, supra), related that all *1007 studies testing the sexual orientation of children of lesbians found, "[t]he percentages of lesbian daughters did not vary as a function of mothers’ sexual orientation” and concerning sexual interests, "there were no significant differences between children of lesbian and heterosexual mothers”. (Patterson, Children of Lesbian and Gay Parents, Child Dev J, at 1025 [Oct. 1992]; also in accord are: Developments In The Law —Sexual Orientation And The Law, 102 Harv L Rev 1508, 1639 [1989]; Loomis, An Alternative Placement For Children In Adoption Law: Allowing Homosexuals The Right To Adopt, 18 Ohio N U L Rev, 631, 661 [1992]; Dickson, Gay Parents: A Legal Oxymoron in Ohio?, 18 Cap U L Rev 277 [1989]; Encyclopedia of Homosexuality 947 [Dynes ed 1990].)
Similarly, an Ohio court in Conkel v Conkel (31 Ohio App 3d 169, 509 NE2d 983 [Ohio App 1987]) stated, "This court takes judicial notice that * * * there is substantial consensus among experts that being raised by a homosexual parent does not increase the likelihood that a child will become homosexual.” (31 Ohio App 3d, at 172, 509 NE2d, at 986, supra.)
Patterson’s article (id.) also reviewed studies that addressed the following additional developmental aspects of children of lesbian parents: gender identity, moral maturity, intelligence, psychiatric disturbances, behavioral and emotional problems, and relationships with peers and adults. The conclusions were all the same: "In summary, concerns about difficulties in personal development among children of gay and lesbian parents are not sustained by results of existing research. As was true for sexual identity, studies of other aspects of personal development * * * revealed no significant differences between children of lesbian or gay parents and children of heterosexual parents * * * fears that children of gay and lesbian parents suffer deficits in personal development appear to be without empirical foundation” (id., at 1033).
In her concluding remarks, Patterson states, "There is no evidence to suggest that psychological development among children of gay men or lesbians is compromised in any respect relative to that among offspring of heterosexual parents.” (Id., at 1036; for the same conclusion from another review of the available psychological studies, see, This Child Does Have Two Mothers, op. cit.) A Massachusetts court in Bezio v Patenaude (381 Mass 563, 578, 410 NE2d 1207, 1215-1216 [1980]) relied on the psychology expert’s additional testimony as follows: " 'There is no evidence that children who are raised with a loving couple of the same sex are any more disturbed, unheal *1008 thy, maladjusted than children raised with a loving couple of mixed sex. (Sexual orientation of the parent) is irrelevant to (the child’s) mental health.’ ”
Another concern sometimes voiced when discussing lesbian adoptions is social stigma, which some fear will emotionally damage the child. This too is apparently an unfounded concern, as "[s]tudies show this fear to be unjustified.” (16 Law and Psychol Rev, op. cit., at 189.) Further, "[rjesearch indicates that children in homosexual households experience no significant increase in the level of peer teasing and rejection when compared to children in heterosexual households.” (Loomis, In re Adoption of Charles B.: Opening the Doors of Ohio Adoption Law, 17 Ohio N U L Rev 361, n 93 [1990], citing from Gay Parenting: Myths and Realties, 9 Pace L Rev 129 [1989], citing from Green, The Best Interests of the Child with a Lesbian Mother, 10 Am Acad Psychiatry & L 7 [1982].) Also, Patterson concludes, "Overall, then, results of research to date suggest that children of lesbian and gay parents have normal relationships with peers”. (Children of Gay and Lesbian Parents, op. cit., at 1034.)
Further, a lower court in New Jersey (Matter of Adoption of a Child by J.M.G., 267 NJ Super 622, 632 A2d 550 [1993]) in an opinion granting an adoption to a lesbian life partner noted: "Indeed, if there is ever any harassment or community disapproval, this court should have no role in supporting or tacitly approving such behavior. The court’s recognition of this family unit through the adoption can serve as a step in the path towards the respect which strong, loving families of all varieties deserve.” (267 NJ Super, at 626, 632 A2d, at 552, supra.)
This court is aware that these cases present family units many in our society believe to be outside the mainstream of American family life. The reality, however, is, that most children today do not live in so-called "traditional” 1950 television situation comedy type families with a stay-at-home mother and a father who works from 9:00 to 5:00. According to Bureau of the Census statistics, 25% of children today are born out of wedlock to single women, mostly young, minority, and impoverished; half of all marriages end in divorce; and married couples with children now make up only 26% of United States households. It is unrealistic to pretend that children can only be successfully reared in an idealized concept of family, the product of nostalgia for a time long past.
*1009 The family environments presented in these adoption cases are warm, loving and supportive, well suited for the nurturance of children. The court is less concerned for the welfare of these adoptive children than for many of the children of heterosexual parents who find themselves before the court. In short, these adoptions were granted because it was in the children’s best interests to do so.