**In the Interest of * Peter HART**
(d.o.b.: ⸺ ⸺, ⸺)

and

**George Hart (d.o.b.: ⸺ ⸺, ⸺)**

Family Court of Delaware,
New Castle County.

Hearing: June 27, 2001.
Adoption Ordered: June 27, 2001.
Decided: Sept. 28, 2001.

Ellen S. Meyer; Shakuntla L. Bhaya, Doroshow Pasquqle Krawitz Siegel & Bhaya, Wilmington; Norman C. Simon (pro hac vice), Kramer Levin Naftailis & Frankel, LLP; Ruth Harlow, Lambda Legal Defense & Educ. Fund, New York City (pro hac vice), for Petitioners.

Jennifer L. Barber, Wolf, Block, Schorr and Solis–Cohen, Wilmington, Guardian Ad Litem for Peter and George Hart.

POPPITI, Chief Judge.

### FACTS OF RECORD FROM RELATED FILES

1. Peter and George, the children who are at the heart of this petition, started their separate journeys to the Family Court along the same troubled path.

2. Peter was the child in interest in a termination of parental rights/adoption proceeding commenced in ⸺ County on June 16, 1999—captioned In the Matter of Darrell Peter Hill, Jr. A Minor Child.

The Social Report dated July 29, 1998, prepared by staff of the Division of Family Services in conjunction with a Petition for

* Pseudonyms have been used at the request of certain participants in this case.

Termination of Parental Rights and the Report on Proposed Adoption dated June 25, 1997, prepared by staff of Children and Families First reveal that Darrell Peter, a black male, was born premature at thirty-three weeks gestation and tested positive for cocaine. At birth Darrell had jaundice and apnea. Since Peter's biological mother was a long-term cocaine addict he was considered at risk of developing a life-threatening illness (AIDS). Peter remained in the hospital for 14 days before finally being discharged to the custody of his biological parents.

On June 7, 1999, a Judge of the Family Court of the State of Delaware in and for _____ County entered an order terminating the parental rights of Peter's biological parents for the purpose of an anticipated adoption by Gene Hart, a gay Caucasian man who had been living in a committed relationship with Burke Shiri, a Caucasian male, for some 20 years.

In recommending that Peter be adopted by Gene Hart, the Report on Proposed Adoption prepared by Merrijane Pierce, L.C.S.W., Adoption Team Leader with Children and Families First, dated June 25, 1999, noted in pertinent part:

[Peter's] progress in this home is a testament to the stimulating environment and positive parenting provided by [Mr. Hart] and [Mr. Shiri.]

The Report to the Court dated June 14, 1999, prepared by the Court Appointed Special Advocate (CASA) noted Peter's placement history as follows:

| Age | Placement |
| --- | --- |
| Birth to 2 months | Parents |
| 2 months to approximately 4 months | Paternal Grandmother |
| 4 months | Parents |
| 4½ months | Paternal Grandmother |
| 9½ months | Foster Parent # 1 |
| 24 months | Foster Parent # 2 |
| 34 months to present | Gene Hart as pre-adoptive and adoptive parent and Burke Shiri |

In recommending that the Court grant the Petition for Adoption the CASA noted:

[Peter] has made remarkable progress in his present home. He was thought to be retarded or autistic. His pre-adoptive parent heard this, and now states how wrong they were. [I and others] who remember when [Peter] was so "hyper" can look back and see the remarkable progress he has made with his pre-adoptive parent. [Peter] can express himself with words and music; with continuing efforts on behalf of those involved with him, I feel he will continue to develop to his full potential.

[Peter] ... is a very sensitive child. His pre-adoptive parent told me that after his prayers he has said several times that he is "scared." When asked what he is scared of he says "I'm afraid they will come and take me away and put me with a stranger." It is clear to me that it is in [Peter] best interest to be adopted into his present home. Even though he is young, I believe his expression of fear indicates how much he wishes to remain in a home where he has bonded and feels safe.

On July 27, 1999, another Judge of the Family Court of the State of Delaware in and for _____ County signed the Order of Adoption in the best interest of Peter in behalf of Gene Hart–a gay man living in a committed relationship with Burke Shiri. In signing the referenced order the Court stated as follows:

... upon the Petition of [Gene Hart] and upon a report of the Department of Services for Children Youth and Their Families, Division of Family Services recommending entry of a final decree of adoption ... and the Court being of the opinion that the Petitioner, [Gene Hart], is qualified to properly maintain, care for and educate the said child and that

the best interests of the said child is suitable for adoption . . .

4. George was the child in interest in a termination of parental rights proceeding commenced in _____ County on May 12, 2000—captioned In the Matter of Quinton Hill A Minor Child. The Social Report dated July 25, 2000, prepared by staff of the Division of Family Services in conjunction with a Petition for Termination of Parental Rights reveals that George, Peter's full biological brother, was born premature weighing only 4 lbs., 10 oz., had a reduced heart rate, and tested positive for cocaine. Since he was considered at risk of a life-threatening illness (AIDS) he was placed on AZT for a period of one month.

The Division of Family Services, as part of an adoption plan wherein Gene Hart, living in a committed relationship with Burke Shiri would adopt George, placed him in the home of Gene Hart and Burke Shiri upon his release from the hospital on November 16, 2000.

On February 16, 2001, a Judge of the Family Court of the State of Delaware issued an order terminating the parental rights of George's biological parents. In the Court's findings of fact the Judge noted in part:

Although after birth [George] experienced withdrawal from cocaine exposure he now seems to be developing appropriately. It is unclear as to how his cocaine exposure will affect him later in life. The foster parents, however, are experienced in dealing with children with difficulties due to their experience in caring for [Peter]. [Peter] suffers from ADHD, epilepsy, and significant behavioral problems. According to the adoption worker Merrijane Pierce, L.C.S.W., Adoption Team Leader with

Children and Families First, [George] has bonded well with the foster family.

In addressing the "best interests" standard, the Judge stated in pertinent part as follows:

.        .        .        .        .

Factor three involves the interaction and relationship of a child with relatives and other persons. Here, the Court finds that [George] has developed a close and loving relationship with his foster parents, who intend to seek adoption . . .

. . .

[George] has the right to expect placement in a stable and permanent home. He also has the right to expect a caregiver who is willing to address his unique needs. Foster placement in a pre-adoptive home has provided that stability and permanency, as well as a family who is willing to dedicate itself to him.

On April 23rd, 2001, the Judge signed the Order of Adoption in the best interests of Quinton, now George, in behalf of Gene Hart—a gay man living in a committed relationship with Burke Shiri for some 22 years.

In signing the referenced order the Court stated as follows:

[U]pon the Petition of [Gene Hart] and upon a report of the Department of Services for Children Youth and Their Families, Division of Family Services recommending entry of a final decree of adoption . . . and the Court being of the opinion that the Petitioner, [Gene Hart], is qualified to properly maintain, care for and educate the said child and that the best interests of the said child is suitable for adoption . . . .

Both Peter and George are children who were considered difficult to place.[1] As

---

1. Mary Lou Edgar, M.S.W., Licensed Clinical Social Worker, testified that children who are older, are members of a minority group, are members of a sibling group, have suffered from prenatal drug exposure, or have physical

such, they faced lives being shuffled around in the care of a state system, which while critically important for the care of children who can't even dream of a place to call home, frequently falls far short of achieving the goal of permanency. As a result of this Court's orders of adoption both Peter and George became the children of Mr. Hart entitled to the same rights and privileges and subject to the same duties and obligations as if they had been born to him. 13 *Del. C.* § 919.

## NATURE OF PROCEEDINGS

5. On June 1, 2000, Burke Shiri, filed a Petition for Adoption by Stepparent in the interest of Peter Hart. Mr. Shiri filed an identical Petition for Adoption by Stepparent in the interest of George Hart on May 9, 2001. The cases were consolidated for all purposes.

The Court initially appointed the Honorable Jan R. Jurden, who was then in the private practice of law, as Guardian *Ad Litem* for Peter and George. Upon Judge Jurden's investiture to the Office of Associate Judge of the Superior Court of the State of Delaware, the Court appointed Jennifer Barber, Esq. to assume the role of Guardian *Ad Litem* for both boys.

## JURISDICTIONAL QUESTION

Although the Petitioner and all interested participants agree that the Court possesses both the jurisdiction and the authority to grant this petition, it is important to thoroughly examine the basis for this conclusion.

6. The initial questions for the Court to consider in this matter are as follows:

Does Burke Shiri, a non-spouse, have standing to bring a petition for adoption? If so, can the child be adopted

without altering Gene Hart's parental rights?

The answer to these questions is in the affirmative. Further, for reasons stated herein the Court concludes that, expecting the adoption is in the child[ren]'s best interest, to answer otherwise would be absurd, unreasonable and unnecessary.

## FACTS ASSERTED AND PROVEN RELEVANT TO JURISDICTION [2]

7. Gene Hart and Burke Shiri, his life partner, have lived together in a committed relationship since the summer of 1979. In their nearly 22 years together they have shared legal and financial responsibilities as co-equals—they pool their income, have co-signed mortgages on the homes they have owned, and have designated each other as beneficiaries on their respective retirement plans and life insurance policies.

As part of an adoption plan developed by the Division of Family Services, Peter was placed in the Hart/Shiri home on March 30, 1998. The Adoption Home Study prepared by Merrijane Pierce, L.C.S.W., Adoption Team Leader with Children and Families First, noted that Mr. Shiri would "provide emotional support and concrete help" to Mr. Hart in raising Peter and further noted that he would assist Mr. Hart with Peter's "care and nurturance." The study added:

[Burke] is a calm, patient man who supports [Gene's] decision to adopt a child. [Gene] is the identified adoptive parent but [Burke] is willing to help [Gene] with the parenting placement into their home, [Mr. Shiri] has functioned in every respect as a parent of [Peter], sharing responsibilities for [Peter's] day to day care—he provides both emotional and financial support, helps to nurture

and/or emotional challenges are considered hard to place.

2. The Court is satisfied that all facts referenced herein have been proven by clear and convincing evidence.

his intellectual and physical development and raises [Peter] in his own religious faith—being Quaker.

The bond between Mr. Shiri and George is no different. Since the day George was placed in their residence, on November 16, 2000, Mr. Shiri has functioned in every respect as a parent to George.

## LEGAL ANALYSIS

8. The adoption of children by those who could not have children, while an ancient practice recognized in both Babylonian and Roman Law, was unknown at common law, existing in the United States only by virtue of legislative action of individual states beginning in the middle of the nineteenth century.[3]

While it is a basic tenet of statutory construction that statutes operating in derogation of the common law must be strictly construed[4], early decisional law in Delaware addressing Delaware's Adoption Law embraced the more enlightened so called liberal statutory construction.[5] When presented with an issue of the construction of the Delaware Adoption Law, the Court of Chancery in the case of *In re Kline*, 8 A.2d 505 (Del.Orph.1939), cited with approval an earlier Court of Chancery decision setting out the Rule of statutory construction

when the statute in question is remedial in nature and where language of the statute does not specifically address the matter before the Court. The Court ruled:

> [W]hen [the meaning of the statute can not be found by] implication ... in the language of the act, search must be had to the general purpose the Legislature had in mind, the sort of evil it was trying to meet and the adequacy of the act as construed to remedy it ... If language is susceptible of two constructions, that one may legitimately be adopted which will give efficacy to what the Court conceives to have been the purpose which the Legislature sought to accomplish. *Keedy v. Sterling Electric Appliance Co.*, Del.Ch., 115 A. 359, 361 (1921).

For statutes that seek to redress a wrong, it is appropriate therefore, to construe them in a liberal manner to best remedy that wrong. 3 *Sutherland Statutory Construction*, § 60.01 (5th Ed.1993). This interpretation allows the so-called remedial acts to "apply to more things or in more situations than would be the case under a strict construction." *Id.* Such a construction extends the life and meaning of a statute for generations of social change—adapting to and being influenced by the ever-changing needs of society.[6]

---

3. As reported by one author: "The earliest adoption statute in the United States permitted adoption by means of deed, without court proceedings of any kind. A Massachusetts statute of 1851 was the first to require a formal judicial proceeding. Adoption by deed persisted in other states for many years thereafter, but such provisions have gradually been repealed, and today every state requires that adoption be by judicial proceeding." 3A *Sutherland Statutory Construction*, § 68.04 (5th Ed.1993) (citing *Moppets on the Market: The Problem of Unregulated Adoptions*, 59 YALE L.J. 715, 725 (1950)).

4. "Statutes on adoption are ... in derogation of the common law. They have for that reason, sometimes been given narrow inter-

pretation in favor of the natural parents, as application of the statute severs the parental relationship forever." 3A *Sutherland Statutory Construction*, § 68.04 (5th Ed.1993).

5. The weight of authority supports the liberal rather than strict construction for adoption "to the end of facilitating the provision of homes and parental care for children." 3A *Sutherland Statutory Construction*, § 68.04 (5th Ed.1993).

6. Considerations such as the nature of the interests affected by a statute as well as the characteristics or circumstances of people affected by a statute are valid considerations in determining the means to interpret a statute. 2C *Sutherland Statutory Construction*, § 58.04

Precisely how broadly a statute may be read using this tenet of statutory construction depends on the circumstance of the matter before the Court. "Broadly speaking, the language of a statute will be extended to include situations which would reasonably have been contemplated by the legislature in light of the circumstances giving rise to the legislation. If the language of a statute reasonably covers a situation, the statute applies irrespective of whether the legislature ever contemplated that specific application." 2C *Sutherland Statutory Construction*, § 54.04 (5th Ed.1993).

In *Kline*, the Court looked first then to the specific social purpose of the adoption statutory scheme stating:

> One of the principal objects of the statute is to permit the placing of unfortunate children, who are unable to provide for themselves or whose parents by their neglect or conduct fail to provide for them, under the care of persons who are willing and able to provide such care and in furtherance thereof to transfer to the adoptive parents, not only the custody of such children, but also the legal duties and consequences which would attach if such children had been born of them.

*Kline*, 8 A.2d at 508. Moreover, in construing Delaware's Adoption Law liberally, the Court in *Kline* noted the benefit that would not otherwise accrue to society and to the effected children if the statute were read restrictively. The Court stated:

> If the [statute] is constructed [more restrictively] the benefit of the statute would be denied to every abandoned child maintained at public or private expense ... On the other hand, if the [statute] ... is construed [liberally] a great many more abandoned children

through adoption proceedings would receive the benefits of home life and training ... It is inconceivable to believe that it was the legislative intent that the meaning of the words in question was to be so restricted ... If the meaning of the words should be so restricted, one of the most salutary provisions of the statute could be unduly limited if not substantially defeated.

*Id.* Delaware's decisional law therefore, recognized a statutory scheme designed to effect a social good and to eliminate an unfortunate social circumstance for innocent children—over time—and adopted the more enlightened rule of statutory construction.

In 1992 when the General Assembly rewrote Delaware's Adoption Law, the resulting statutory scheme left no question—if there was any question—as to how provisions of the adoption statute should be construed—namely with the so called "generous liberal acceptance and liberal construction." 2C *Sutherland Statutory Construction*, § 58.04 at 81(5th Ed.1993). To this end, 13 *Del. C.* § 932 provides:

> This chapter is designed to achieve without undue delay the paramount objectives of the best interest of the child, and all questions of interpretation shall be resolved with that objective in mind. Where there appears to be a conflict between the best interest of the parent[s] and the child the best interest of the child shall prevail.

█ 9. As previously stated, the first question becomes, does Mr. Shiri have standing to bring these petitions for adoption? The answer is clearly in the affirmative. 13 *Del. C.* § 903 provides:

> An unmarried person or a husband and wife jointly, who are not legally separated or who are not living apart from each

(5th Ed.1993.). To this end, it is a generally accepted principle of statutory construction that "statutes which are enacted to relieve

personal disadvantage, hardship, and suffering are generally accorded general judicial acceptance and liberal construction." *Id.*

other, or a divorced or legally separated person, being a resident of the State at the time of filing the petition or with whom a child has been placed for adoption under § 904 of this title, and being over 21 years of age, may petition the Family Court for an order authorizing the petitioner or petitioners to adopt a child not his, hers, or theirs.

It is uncontroverted that Mr. Shiri is an unmarried person and was a resident of Delaware at the time of the filing of the petitions.[7]

10. Does the fact that Mr. Shiri would constitute a second adoptive parent for the children in question constitute a bar to his standing to bring the petitions? The answer is in the negative.

Notably the language of 13 *Del. C.* § 903 does not prohibit so-called "second parent" adoptions. Indeed, the term "unmarried person" though stated in the singular can be read to include the plural "unmarried persons" since 1 *Del. C.* § 304(a) provides:

Words used in the singular number include the plural and the plural includes the singular.

Although the Delaware General Assembly may not have specifically contemplated adoption by a "second parent" when enacting the adoption laws of this State, it is inconceivable to conclude, given the statutory mandate to read the statute in best interest of children, that our Legislature would have meant to exclude loving and nurturing two parent homes as a resource for some of the states most needy children. This Court in *In re Kenneth*, Del.Fam., File No. 91–10–10A, Wakefield, J., 1992 WL 208410 (1992), which will be discussed

in more detail hereinafter, in granting an adoption resulting in the child having a biological mother living in one household and an adoptive father who was formerly married to the mother living in another household, cited with approval the previously quoted purpose of the adoption statutory scheme espoused in *Kline, supra* at 508. Commenting about the holding in *Kline*, the Court stated:

The Court deems it significant that the language of the Court uses the plural "parents" which suggests that either or both of the parents "fail to provide" them adoption by some other person is appropriate. *More importantly the language of the decision also uses plural persons to suggest that it is appropriate for more than one person to be an adoptive parent.* While the framers of the statutory scheme for adoption may have considered only intact families as prospected adoptive parents, the vagaries of modern life suggests that such limitation may not always be appropriate in today's world. Although certainly no one can quarrel with the concept that one home is the preferable approach to child rearing, nevertheless there are exceptional cases in which a child may benefit from involvement in a second family.

*Kenneth*, 1992 WL 208410 at *5 (emphasis added).

Interpreting Delaware's statute to allow "second parent" adoptions is therefore, consistent with the legislative mandate to interpret the statute in "the best interest of the child." 13 *Del. C.* § 932. Indeed, allowing "second parent" adoptions would serve the best interests of a child in many important ways:[8]

---

**7.** The statute of eligibility is clear and unambiguous on its face and as such the Court's proper role is limited to the application of the literal meaning of those words. *See In Re Adoption of Swanson*, 623 A.2d 1095, 1097(Del.Supr.1993). In *Swanson* the Court

reversed a ruling of the Family Court that denied the adoption of an adult male by his companion of 17 years.

**8.** The rights listed are not sufficiently protected through the legal alternatives to adoption

- The right to Social Security benefits;
- The right to life insurance benefits;
- The right to sue for wrongful death of a parent;
- The right to inherit by and through each other;
- Eligibility for coverage under *both* parents' health insurance.

*See In re Jacob, In re Dana,* 86 N.Y.2d 651, 636 N.Y.S.2d 716, 660 N.E.2d 397 at 399 (1995). For the Court to ignore what exists in fact in the best interests of children would ignore logic; be antithetical to the needs and bests interest of children who are being cared for, raised and nurtured in a home where two adults are committed and dedicated to their welfare; and produce an absurd and unacceptable social result. In short, to rule otherwise would violate the clear mandate of the statute to "resolve all questions of interpretation" in the children's best interest. 13 *Del. C.* § 932.

■ 11. The inquiry does not however, end here. Having concluded that Mr. Shiri has standing to bring the petitions, the question becomes may the petitions be granted in the best interests of the children without first altering the parental rights of Mr. Hart? The answer is in the affirmative.

As in other jurisdictions, Delaware law provides that when a child is adopted by a stepparent "his, or her relationship to his birth parent who is married to the stepparent shall in no way be altered by reason of the adoption."[9] 13 *Del. C.* § 919(b).

Although Delaware law does not define the term "stepparent," this Court in *Kenneth* recognized that under appropriate facts a person who may not have any legal duty to a child might maintain such a strong parental relationship with the child similar to that of a natural parent that he/she should be considered a *"de facto parent."* In fact then—when the facts support the conclusion—even where there is no legal relationship—a *de facto* relationship may exist.

While the prospective adoptive parent in *Kenneth* was at one time in fact the child's legal stepparent—he having been married to the child's mother—this Court does not pause over the difference as it relates to the matter *sub judice.* This Court's analysis would be no different if Mr. Shiri were an unmarried male companion seeking to adopt the child of his female companion or *vice versa.* The notion that the analysis should be any different because Mr. Shiri is gay would violate the statutory proscription to resolve all questions of interpretation in the best interest of the children and would produce an absurd and unacceptable social result.[10] 13 *Del. C.* § 932.

such as guardianship and parental contracts. *See* Julia Frost Davies, Note, *Two Moms and a Baby: Protecting the Nontraditional Family Through Second Parent Adoptions,* 29 New. Eng.L. Rev. 1055, 1070 (1995); Emily C. Pratt, *Second Parent Adoption: When Crossing the Marital Barrier Is In a Child's Best Interests,* 3 Berkley Women's' L.J. 96, 108–09 (1987–88); Nancy D. Polikoff, *This Child Does Have Two Mothers: Redefining Parenthood to Meet the Needs of Children in Lesbian-Mother and Other Nontraditional Families,* 78 Geo. L.J. 459, 508 (1990).

9. *See* 15 V.S.A. § 448; N.Y. Dom. Rel. § 117; N.J.S.A. 9:3–50.

10. Marc Wolinsky, *Stereotypes, Tolerance and Acceptance: Gay Rights in Courts of Law and Public Opinion,* Delaware Lawyer, Summer 2001, at 13. It is important to note that the majority of courts considering this issue have permitted "second-parent" adoptions. *See In re M.M.D. & B.H.M.,* D.C., 662 A.2d 837 (1995); *In re K.M. and D.M.,* 274 Ill.App.3d 189, 210 Ill.Dec. 693, 653 N.E.2d 888 (1995); *In re Tammy,* 416 Mass. 205, 619 N.E.2d 315 (1993); *In re J.M.G.,* Ch. Div., 267 N.J.Super. 622, 632 A.2d 550 (1993); *In re Adopton by H.N.R.,* App. Div., 285 N.J.Super. 1, 666 A.2d 535 (1995); *In re Jacob; In re Dana,* 86 N.Y.2d 651, 636 N.Y.S.2d 716, 660 N.E.2d 397 (1995); *In re Evan,* N.Y.Sur.Ct., 153 Misc.2d 844, 583 N.Y.S.2d 997 (1992); *In re*

In point of fact, as in *Kenneth*, Mr. Shiri has fed, bathed, clothed, supported, taught and otherwise cared for Peter and George from the day they were placed in the Hart/Shiri home for adoption by Mr. Hart. As in *Kenneth*, Peter and George have known Mr. Shiri as one of their parents in a two-parent household. As in *Kenneth*, there is no doubt that Peter and George have closely bonded with Mr. Shiri calling him "Poppy". As in *Kenneth*, Mr. Hart the parent of Peter and George strongly supports the adoption claiming in substance—as so well stated by Judge Jurden in her testimony—these children deserve to have the relationship with Mr. Shiri legalized.

Courts that have examined the relationship of "*de facto* parent/stepparent" to a child have described the relationship in ways too numerous to catalogue completely here.[11] At the same time a reflection on some of them, which mirror the relationship that Mr. Shiri has with Peter and George, is instructive. A "*de facto*" parent/stepparent:

● Has the support and consent of the parent who has fostered the formation and establishment of a parent-like relationship with the child.

● Has assumed the obligations of parenthood by taking significant responsibility for the child's care, education and . development—including the child's support, without the expectation of financial compensation.

● Has acted in a parental role for a length of time sufficient to have established a bonded and dependent relationship that is parental in nature.

● Has helped to shape the child's daily routine by addressing developmental needs, disciplining the child, providing for the child's education and medical care and serving as a moral guide.

● Has on a day to day basis, through interaction, companionship, interplay, and mutuality, fulfilled the child's needs for a psychological adult who helped fulfill the child's needs to be loved, valued, appreciated and received as an essential person by the adult who cares for him.

*Camilla*, N.Y.Fam.Ct., 163 Misc.2d 272, 620 N.Y.S.2d 897 (1994); *In re Caitlin*, N.Y.Fam. Ct., 163 Misc.2d 999, 622 N.Y.S.2d 835 (1994); *In re B.L.V.B. and E.L.V.B.*, 160 Vt. 368, 628 A.2d 1271 (1993). *But see In re T.K.J. and K.A.K.*, Colo.Ct. App., 931 P.2d 488 (1996); *In re Baby Z.*, 247 Conn. 474, 724 A.2d 1035 (1998); *In re Angel Lace M.*, 184 Wis.2d 492, 516 N.W.2d 678 (1994). The Court is mindful that the partner of the "second parent" was the biological parent of the child. In the case at bar, Petitioner's partner is not the biological parent but rather the adopted parent of the child. This however, is a distinction without a difference. Under Delaware law, once adopted the child is considered the "natural" child of the adopting parent. *Jackson v. Riggs Nat'l Bank*, Del.Supr. 314 A.2d 178, 182 (1973) ("The public policy of our State, reflected [in 13 *Del. C.* §§ 919,

920] is that adopted children are to be considered under the law as natural children.").

**11.** *See Carter v. Brodrick*, 644 P.2d 850, 854 n. 2 (Alaska 1982) (This adult becomes an essential focus of the child's life, for he is not only the source of fulfillment of the child's physical needs but also the source of his emotional and psychological needs ....); *E.N.O. v. L.M.M.*, 429 Mass. 824, 711 N.E.2d 886, 891 (1999) (A *de facto* parent is one who has no biological relation to the child, but has participated in the child's life as a member of the child's family.); *S.F. v. M.D.*, Ct.Spec.App., 132 Md. App. 99, 751 A.2d 9 (2000); *V.C. v. M.J.B.*, 163 N.J. 200, 748 A.2d 539 (2000) ("[o]nce a third party has been determined to be a psychological parent to a child, under the previously described standards [of *de facto* parent], he or she stands in parity with the legal parent.").

*See In re H.S.H.-K.,* 193 Wis.2d 649, 533 N.W.2d 419, 435–36 (1995). In fact, in every respect, Mr. Shiri is a parent of Peter and George.

## BEST INTEREST ANALYSIS

██ 12. The final consideration this Court undertakes in every adoption is to determine whether granting this petition is in the best interests of the children at issue, as examined against the factors specified in 13 *Del. C.* § 722.

> a) *The wishes of the child's parent or parents as to his or her custody and residential arrangements.*

The depth of Mr. Hart's commitment to the success of this petition is readily apparent. He has embraced these children and brought them into a home that he and Mr. Shiri share with an eye toward creating a cohesive family. His desire and intent has been witnessed by all involved at every stage of this case. The language of prior Social Reports, CASA reports and Court orders bear witness to his dedication to these boys and to their family unit that would not be complete without "Poppy." Furthermore, the Court notes that attached to the Petition for Second Parent Adoption is an Affidavit of Consent executed by Mr. Hart giving his blessing to the adoption.

> b) *The wishes of the child as to his or her custodian(s) and residential arrangements.*

Although Peter and George did not testify about their wishes, the evidence presented by Mr. Shiri speaks volumes about how the children feel and what they want.[12] Merrijane Pierce, L.C.S.W. Adoption Team Leader with Children and Families First, and Mary Lou Edgar, M.S.W., Licensed Clinical Social Worker, both provided the Court with vivid detail of how Mr. Shiri is not only involved in—but critical to—the lives of the boys. They both observed that the boys are equally bonded to both Mr. Hart and Mr. Shiri.

Ms. Miller, a family friend, also testified that both boys are very attached to their "Poppy." Her observations are compelling in that she holds a Master's Degree in Special Education and a Ph.D. in Special Education with a focus in behavior analysis.

> c) *The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship ...with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interests.*

The Court heard testimony from nine witnesses, each of whom testified about the close and loving bond that Peter and George share with Mr. Hart, Mr. Shiri and their extended families. The witnesses reinforced the findings of this Court, wherein the Judge in _____ County determined in his order terminating the rights of George's biological parents, that "[George] has developed a close and loving relationship with [Mr. Hart and Mr. Shiri]." The Court record provides similar findings regarding Peter.

---

**12.** Although previously quoted, the observations of Peter's attachment to his caregivers bears repeating:

> [Peter] ... is a very sensitive child. His pre-adoptive parent told me that after his prayers he has said several times that he is "scared." When asked what he is scared of he says "I'm afraid they will come and take me away and put me with a stranger." It is clear to me that it is in [Peter] best interest to be adopted into his present home. Even though he is young, I believe his expression of fear indicates how much he wishes to remain in a home where he has bonded and feels safe.

Ms. Shiri, Mr. Shiri's mother, testified that although she lives in Virginia she visits with the boys as often as she can. She and her husband make every effort to be present for the special events in Peter and George's lives. In fact, at the time of the hearing she and her husband had recently traveled to Delaware to watch Peter perform in a play.

Mr. Jefferson, Mr. Hart's stepfather, told the Court of the pleasure he derives from spending time with the boys. He does things with them that a typical "pop-pop" would do like playing ball or watching videos. The familial affection does not stop there. He stated that Mr. Hart's siblings fully accept and love Peter and George. He told the Court how Peter and his nine-year-old cousin play together as frequently as possible.[13]

Both Judge Jurden and Jennifer Barber, Esq. echoed the sentiment that the children are extremely happy boys who love both Mr. Hart and Mr. Shiri equally.

*d) The child's adjustment to his or her home, school and community.*

Peter and George have not only adjusted in their home, school and community— they have thrived. Ms. Douglass, a former church schoolteacher of Peter's, testified that when Peter entered her class he was full of energy and often found focusing to be a challenge. After about a year in the Hart/Shiri home, she saw substantial improvement in his behavior and focus. She also stated that Peter seems more advanced in his emotional expression, often taking the time to talk with or comfort a classmate who is upset or sad.

The Social Reports[14] and the testimony of the guardians *ad litem* highlight the adjustment of the boys. Ms. Barber spoke of a recent visit she made to the new home of the Hart/Shiri family and quipped that it contained more toys than furniture. While there, she observed the close and loving bond between Mr. Shiri and the boys. She described the environment as a loving and stable one—a home setting that is considered by some, to be all too rare in this day and age.

*e) The mental and physical health of all individuals involved.*

The Social Reports submitted in this case and the underlying cases reveal that Mr. Shiri and Mr. Hart are in good mental and physical health.

*f) Past and present compliance by both parents with their rights and responsibilities to their children under § 701 of this title.*

Every witness that testified before this Court reported that Mr. Shiri and Mr. Hart take their roles as parents very seriously. They both realize that their family will face some unique challenges because they are a same-sex couple who are raising children of another race. Merrijane Pierce described the steps both men have taken to build the proper support network and to develop the necessary skills to deal with any potential problems.

Both Mr. Hart and Mr. Shiri are involved in a number of adoptive parent

13. The Social Report dated June 1, 2001, states that "[Burke and Gene] maintain a close relationship with [Gene's] mother and stepfather, sister and nieces".

14. The Social Report issued in relation to this petition, prepared by Merrijane Pierce, L.C.S.W., outlined the significance of Mr. Shiri in the lives of Peter and George. By way of example, she states, "[Burke], in an effort to encourage [Peter's] creativity and fine motor skills, does craft projects with [Peter] ( [George] is still too young) and at Christmas, he and [Peter] made snowflakes and Santa Claus hats to decorate the walls of the living room."

support groups, same-sex parent support groups, interracial adoption support groups, and parenting groups. These groups provide not only helpful information to both of them, they also expose Peter and George to families similar to their own. These support groups also provide fun activities for the boys. The Social Report prepared by Merrijane Pierce notes that Peter took first place in a talent show at the 1999 foster parent picnic.

With friends and family the Hart/Shiri household engages in a variety of activities intended to provide the boys with information on and connection with their heritage. They celebrate Kwanza, go to art galleries, and attend cultural fairs. All of these activities, peer groups, and experiences caused Mary Lou Edgar, M.S.W., to comment that she believes that these children will grow up to be wonderfully tolerant adults.

Mr. Hart and Mr. Shiri have also placed close attention to the spiritual and educational development of Peter and George. The family attends services at a local Quaker meetinghouse and Peter attends church school classes there. Ms. Douglass provided the Court with a picture of a child who enjoys his church lessons and enjoys his family.

The evidence presented clearly demonstrates the commitment of the Hart/Shiri household to these boys. Mr. Hart remains at home with the children providing the attention and nurturing that the boys need, and Mr. Shiri financially supports the family. They have recently purchased a new home so that the boys will have more room to grow.

The testimony paints a compelling picture of two people who are dedicated to being good parents. They are aware of their responsibility for Peter and George and their special needs, and they have embraced it.

g) *Evidence of domestic violence as provided for in Chapter 7A of this title.*

The Social Reports submitted in this case and the underlying cases reveal that neither Mr. Shiri nor Mr. Hart have a criminal history nor a history of child abuse.

13. The list of factors enumerated in 13 *Del. C.* § 722 is not intended to be exhaustive. Indeed, the Court is duty bound to consider any and all facts, which may effect the best interests of the children.

Clearly the relationship between the persons who have been and will be parenting Peter and George is a factor that is of critical importance to the Court. The fact that Mr. Hart and Mr. Shiri are gay men in and of itself is of no concern to the Court.[15]

---

15. *See M.A.B. v. R.B.*, N.Y.Sup.Ct. 134 Misc.2d 317, 510 N.Y.S.2d 960, 964–965 (1986)(citing Rivera, *Queer Law: Sexual Orientation Law in the Mid–Eighties*, 11 U. DAYTON L. REV. 275, 329); Margaret Crosbie Burnett and Lawrence Heimbrecht, *A Descriptive Empirical Study of Gay Male Stepfamilies*, 42 Family Relations 256, 257 (1993); Marie Weston Evans, *Parent and Child; M.J.P. v. J.G.P.: An Analysis of the Relevance of Parental Homosexuality in Child Custody Determinations*, 35 OKLA. L. REV. 633, 642–43, 649–650 (1982); Charlotte J. Patterson, *Children of Lesbian and Gay Parents, in Advances in Clinical Child Psychology*, 235, 244 (Thomas H. Ollendick and Ronald J. Prinz Eds., 1997); Charlotte J. Patterson and Richard E. Redding, *Lesbian and Gay Families With Children: Implications of Social Science Research for Policy*, 52 J. SOC. ISSUES 29, 37–39 (1996); Julie Shapiro, *Custody and Conduct: How the Law Fails Lesbian and Gay Parents and Their Children*, 71 IND. L.J. 623, 646 (1996); William E. Adams, Jr., *Who's Family is it Anyway? The Continuing Struggle for Lesbians and Gay Men Seeking to Adopt Children*, 30 NEW ENG.L.REV. 579, 592–595 (1996); Pauline H. Turner, et. al. *Parenting in Gay and Lesbian Families*, 1 J. GAY & LESBIAN PSYCHOTHERAPY 55, 57 (1990).

This sentiment on the part of the Court in the matter *sub judice* in fact mirrors the sentiment of my colleagues in In the Matter of Darrell Peter Hill, Files No. _-_-_TPR, _-_-_A, and In the Matter of Quinton Hill, Files No. _-_-_TPR, _-_-_A, for when Mr. Hart adopted first Peter and then George the fact that these men are gay was not even mentioned. In fact and therefore in law, what does matter in the best interests of both Peter and George is that Gene Hart and Burke Shiri live in a loving and long lasting committed relationship. In fact and in law what does matter in their best interests is that Peter and George have already begun to reap the benefits of the love of these two men and have even in their tender years returned it in kind. In fact and in law what does matter in the best interests of Peter and George is that they are thriving in the environment created by Gene Hart and Burke Shiri.

Having stated the above and for reasons stated on the record the Court concludes that it is in the best interests of both Peter and George to say in the eyes of justice and law what is already in fact—namely:

- Peter Hart—shall be and is HEREBY the adopted child of Burke Shiri.

- George Hart—shall be and is HEREBY the adopted child of Burke Shiri.

**IT IS SO ORDERED.**