**Lacey M. SMITH, Respondent Below, Appellant,**

v.

**Charlene M. GORDON, Petitioner Below, Appellee.**

No. 94, 2008.

Supreme Court of Delaware.

Submitted: Nov. 5, 2008.

Decided: Feb. 3, 2009.

Reargument Denied March 4, 2009.

Michael P. Kelly, Esquire (argued), and Daniel M. Silver, Esquire, McCarter & English, LLP, Wilmington, Delaware, for appellant.

Christine K. Demsey, Esquire, Wilmington, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

HOLLAND, Justice.

The respondent-appellant, Lacey M. Smith ("Smith"),[1] appeals from a final judgment entered by the Family Court. The Family Court held that the petitioner-appellee, Charlene M. Gordon ("Gordon"), had standing as a parent to petition for custody of Smith's adopted daughter, A.N.S.[2] Gordon argued that she is a *legal* parent under the Uniform Parentage Act of Delaware ("DUPA") and that she is also a *de facto* parent. The Family Court concluded that, although Gordon did not qualify as a *legal* parent of the child under the DUPA, Gordon was a *de facto* parent and entitled to the same status as a legal parent for purposes of the standing required to file a petition for custody. The Family Court then granted the parties joint legal and physical custody of A.N.S.[3]

In this appeal, Smith argues that the Family Court erred when it held that a *de facto* parent has standing as a parent to petition for child custody under title 13, section 721(a) of the Delaware Code.[4] She also argues that, even if Gordon did have standing as a *de facto* parent to petition for custody, the Family Court erred when it granted Gordon joint custody because Smith did not consent to Gordon forming a relationship with the child. Gordon did not file a cross-appeal from the Family Court's holding that Gordon was not a *legal* parent under the DUPA.

We have concluded that a *de facto* parent does not have standing as a parent to file a petition for custody under title 13,

---

1. This Court assigned pseudonyms for the parties and the child pursuant to Supreme Court Rule 7(d). Del.Supr. Ct. R. 7(d) (2008).

2. *Smith v. Gordon [L.M.S. v. C.M.G.]*, File No. CN04–08601, Pet. No. 04–20625, 2006 WL 5668820 (Del.Fam. Ct. June 27, 2006).

3. *Gordon v. Smith [C.M.G. v. L.M.S.]*, File No. CN04–08601, Pet. No. 04–20625, 2007 WL 5158172 (Del.Fam.Ct. Mar. 30, 2007).

4. Del.Code Ann. tit. 13, § 721(a) (2008).

section 721(a).[5] Therefore, the judgment of the Family Court must be reversed.

### Facts

Gordon and Smith are two women who met on August 23, 1994, and became involved in a romantic relationship. Gordon moved into Smith's home in February 1995 and lived there until May 2, 2004. On various occasions, the parties met with a financial advisor. They discussed the possibility of executing joint wills with an attorney, but never did so. They were beneficiaries of one another's life insurance policies.[6] In 2004, they opened a joint account to process their joint bills.

Smith and Gordon did not have a commitment ceremony, but were recognized by friends and family as a long-term committed couple. They celebrated August 23 as their anniversary date. Early in their relationship, they briefly discussed having children, but serious conversation on the subject was deferred for several years.

After Smith and Gordon had been together for five years, they felt they had established a "strong relationship" and wanted to have a baby. After failed attempts for Smith to have a child via artificial insemination ("AI") and in vitro fertilization ("IVF"), the couple decided to adopt a child from a foreign country. Because the law of Kazakhstan did not permit two women to adopt the same child, they decided that Smith would be the adoptive parent. Gordon participated in the adoption process and accompanied Smith to Kazakhstan for the adoption in March 2003, but only Smith legally adopted the child, A.N.S.

Gordon took paid adoption leave from her employer and stayed home with A.N.S. for nearly two months. When Gordon's leave ended, she returned to work and Smith began to work from home so that she could stay home with A.N.S. Gordon enrolled A.N.S. as her dependent under the employee benefit plan so that A.N.S. would have medical, dental and vision coverage as well as spending accounts for health care and dependent care. The parties shared the expenses to care for and support A.N.S.

In June 2003, Smith and Gordon met with an attorney to discuss Gordon adopting A.N.S. They left the meeting with the understanding that Gordon would have to care for the child for one year in order for the Family Court to permit the adoption.[7] Gordon did not pursue formal adoption after she had lived with A.N.S. for more than one year.

The testimony regarding the termination of Smith's and Gordon's relationship is disputed. There is no dispute, however, that on May 2, 2004, Smith and Gordon broke up, and Gordon moved out of the house at Smith's request. Smith permitted Gordon to see A.N.S. periodically until June 6, 2004.

### Procedural History

On June 22, 2004, Gordon filed a petition for custody of A.N.S. in the Family Court. In that petition, she alleged that she and Smith intended that both would function as the parents of an adopted child and understood that only one person could initially adopt the child. She further alleged that

5. Because we have determined that a *de facto* parent is not a "parent" with standing to petition for custody under section 721(a), we need not address Smith's second argument that Gordon does not meet the criteria for establishing *de facto* parent status.

6. Smith removed Gordon as the beneficiary of her policy when the relationship ended in May 2004 and listed A.N.S. instead.

7. The accuracy of that legal advice is not decided in this appeal.

the parties anticipated that Gordon would become a second adoptive parent, that Gordon was a co-parent of A.N.S., and that A.N.S. now calls Gordon "Mommy."

On July 6, 2004, Gordon filed a motion for a temporary visitation order. Smith filed a motion to dismiss on the same day. Gordon had no contact with A.N.S. from June 6, 2004, until August 13, 2004, when the parties stipulated to a temporary consent visitation order permitting Gordon visitation without prejudice to Smith's motion to dismiss the custody petition.

On July 22, 2005, Gordon filed a motion to amend her petition for custody, requesting permission to include a request for a determination of parentage under the DUPA in addition to her assertion of her right to seek custody/visitation as a *de facto* parent. In a response filed August 4, 2005, Smith denied that Gordon had standing to bring an action for adjudication under the DUPA because Gordon lacks a biological tie to A.N.S. On September 6, 2005, the Family Court granted Gordon's motion to amend her petition to include a determination of parentage.[8]

The Family Court understood Gordon's position to consist of two arguments, of which one was made in the alternative. Gordon argued that she is a legal parent under the provisions of the DUPA.[9] She claimed that she not only meets the requirements of several statutory provisions but also is a "*de facto* parent," and that this status should result in the Family Court adjudicating her as a parent under the DUPA. In the alternative, Gordon argued that she is a *de facto* parent of A.N.S. and as such has standing under Delaware law to file a petition for custody in the Family Court.

After three and a half days of hearings in January and March 2006 and oral arguments on March 24, 2006, the Family Court issued its decision and order on June 27, 2006. The Family Court determined that Gordon had standing to petition for custody as a *de facto* parent and denied Smith's motion to dismiss. The Family Court found that for the purpose of section 721(a), a "parent" is not restricted to an individual who is a biological or adoptive parent, or who has established a legal parent-child relationship under the DUPA but also includes an individual who has established a relationship with a child as a *de facto* parent.[10] On March 30, 2007, the Family Court granted Gordon joint legal and physical custody of A.N.S.[11]

### Standard of Review

▮▮▮ Upon appeal from the Family Court, this Court reviews the facts and the law, as well as the inferences and deductions made by the Family Court judge.[12]

---

8. Standing to bring an action for adjudication under the DUPA is governed by title 13, section 8–602, which limits standing to "(1) The child; (2) The mother of the child; (3) A man whose paternity of the child is to be adjudicated." Del.Code Ann. tit. 13, § 8–602. Reading this section together with section 8–106, the Family Court explained that a woman whose maternity is to be adjudicated has standing to bring an action for adjudication. Gordon is a woman who whose maternity is to be adjudicated. *See* title 13, § 8–106. Therefore, the Family Court concluded she may request an adjudication of her maternity under the DUPA.

9. Del.Code Ann. tit. 13, §§ 8–101–8–904 (2008).

10. *Smith v. Gordon*, File No. CN04–08601, Pet. No. 04–20625, at 50, 2006 WL 5668820 (Del.Fam. Ct. June 27, 2006).

11. *Gordon v. Smith*, File No. CN04–08601, Pet. No. 04–20625, 2007 WL 5158172 (Del. Fam.Ct. Mar. 30, 2007).

12. *Wife (J.F.V.) v. Husband (O.W.V., Jr.)*, 402 A.2d 1202, 1204 (Del.1979). *See also Green v. Green*, 2008 WL 4696617, at *3 (Del.Supr.).

Findings of fact will not be disturbed unless they are clearly wrong and justice requires that they be overturned.[13] If the Family Court applied the law correctly, the standard of review is abuse of discretion.[14] Errors of law are reviewed *de novo*.[15]

### Custody Petition Requires Parent Status

 Title 13, section 721 of the Delaware Code governs child custody proceedings in Delaware.[16] Section 721(a) relevantly provides: "A child custody proceeding is commenced in the Family Court of the State ... by a *parent* filing a petition seeking custody of the child."[17] Custody disputes between the parents of a child are determined in accord with the best interests of the child standard.[18]

 Someone who is not a parent may petition for and be awarded custody only if the child is dependent or neglected and the

Family Court determines that it is in the child's best interests not to be placed in the custody of the parent.[19] Gordon does not contend that A.N.S. is dependent or neglected. Therefore, Gordon's standing to petition for custody of A.N.S. depends on Gordon's status as a parent.

### Determination of Parentage

There is no definition of parent in Delaware's child custody statute.[20] To determine Gordon's parental status, the Family Court looked to the DUPA[21] because it "applies to determinations of parentage in this State."[22] The DUPA defines "parent" as "an individual who has established a parent-child relationship."[23] A "parent-child relationship" is "the *legal* relationship between a child and a parent of the child."[24] The DUPA provides that a parent-child relationship may be established as follows:

> (2) That the application of the [relevant] standards set forth in §§ 722, 729 and Chapter 7A ... lead the Court to conclude that the child should not be placed in the custody of a parent.

13. *Solis v. Tea*, 468 A.2d 1276, 1279 (Del. 1983). *See also Green v. Green*, 962 A.2d 256, 2008 WL 4496617, at *3 (Del.Supr.).

14. *Jones v. Lang*, 591 A.2d 185, 186 (Del. 1991). *See also Green v. Green*, 962 A.2d 256, 2008 WL 4496617, at *3 (Del.Supr.).

15. *In re Heller*, 669 A.2d 25, 29 (Del.1995) (citing *In re Stevens*, 652 A.2d 18, 23 (Del. 1995)). *See also Green v. Green*, 962 A.2d 256, 2008 WL 4496617, at *3 (Del.Supr.).

16. Del.Code Ann. tit. 13, § 721 (2008).

17. Del.Code Ann. tit. 13, § 721(a) (emphasis added).

18. Del.Code Ann. tit. 13, § 721(e).

19. Del.Code Ann. tit. 13, § 721(e). Section 721(e) relevantly provides:
A custody proceeding between a parent and any other person shall not be decided in favor of the other person unless the Family Court concludes, after a hearing:
(1) That the child is dependent or neglected within the meaning of § 901 of Title 10; and

20. Del.Code. Ann. tit. 13, §§ 721–733 (2008). Delaware's child guardianship statute defines "parent" as "a biological or adoptive parent whose parental rights have not been terminated." Del.Code Ann. tit. 13, § 2302(14) (2008). This Court has held that an adopted child is considered the "natural" child of the adoptive parent. *See Jackson v. Riggs Nat'l Bank*, 314 A.2d 178, 182 (Del.1973) ("The public policy of our State ... is that adopted children are to be considered under the law as natural children.").

21. Del.Code Ann. tit. 13, §§ 8–101–8–904 (2008).

22. Del.Code Ann. tit. 13, § 8–103(a).

23. Del.Code Ann. tit. 13, § 8–102(12).

24. Del.Code Ann. tit. 13, § 8–102(13) (emphasis added).

(a) The mother-child relationship is established between a woman and a child by:

(1) The woman's having given birth to the child;

(2) An adjudication of the woman's maternity; or

(3) Adoption of the child by the woman.

(b) The father-child relationship is established between a man and a child by:

(1) An unrebutted presumption of the man's paternity of the child [ ];

(2) An effective acknowledgement of paternity by the man ... unless the acknowledgement has been rescinded or successfully challenged;

(3) An adjudication of the man's paternity;

(4) Adoption of the child by the man; or

(5) The man's having consented to an assisted reproduction by a woman ... which resulted in the birth of the child.[25]

■ Section 8–602 of the DUPA relevantly provides that "a proceeding to adjudicate parentage may be maintained by ... the mother of the child" or "a man whose paternity of the child is to be adjudicated."[26] Section 8–106 provides that provisions relating to paternity determinations apply to maternity determinations as well.[27] Therefore, a woman whose maternity of the child is to be adjudicated can also bring an action to adjudicate parentage.

■ The Family Court is authorized to adjudicate parentage under the DUPA.[28] Section 8–610 lists "child custody or visitation" as a proceeding in which "parentage *may* be determined."[29] A woman whose maternity of the child is to be adjudicated can therefore seek an adjudication of parentage and custody in the same proceeding. The Family Court would have to first adjudicate the woman a parent of the child and then determine whether to give her custody of the child.

**25.** Del.Code Ann. tit. 13, § 8–201.

**26.** Del.Code Ann. tit. 13, § 8–602(2), (3).

**27.** Del.Code Ann. tit. 13, § 8–106.

**28.** Del.Code Ann. tit. 13, § 8–104 ("The Family Court of the State of Delaware is authorized to adjudicate parentage under this chapter."); Del.Code Ann. tit. 13, § 8–601 ("A civil proceeding may be maintained to adjudicate the parentage of a child. The proceeding is governed by the Family Court Rules of Civil Procedure.").

**29.** Del.Code Ann. tit. 13, § 8–610 (emphasis added). Section 8–610 provides:

"Proceeding in which parentage may be determined."

a) Except as otherwise provided in subsection (c) of this section, a determination of parentage may be made in a proceeding for adoption, termination of parental rights, child custody or visitation, child support, divorce, annulment, probate or administration of an estate, or other proceeding in which the parentage or nonparentage of the child is an element of the claim for relief or a defense, and such a determination is binding as provided in 8–637 of this title. In a proceeding to establish child support, the court is deemed to have made an adjudication of parentage of a child if the court acts under circumstances that satisfy the jurisdictional requirements of § 610 of this title and the final order provides for the support of the child by the man.

b) Except as otherwise provided in subsection (a) of this section, a proceeding to adjudicate parentage may be joined with a proceeding for adoption, termination of parental rights, child custody or visitation, child support, divorce, annulment, probate or administration of an estate, or other appropriate proceeding.

c) A Respondent may not join a proceeding described in subsection (a) of this section with a proceeding to adjudicate parentage brought under Chapter 6 of this title.

There was no adjudication of Gordon's maternity in any prior matter in this State. Gordon's petition for custody, however, contained a request for an adjudication of her maternity under the DUPA. Despite Gordon's arguments, the Family Court found that she could not establish a parent-child relationship under the DUPA.

The Family Court concluded that Gordon did not qualify as a *legal* parent under any determination of parentage in the DUPA. The Family Court determined that Gordon could not establish a *legal* mother-child relationship because she was neither the biological[30] nor adoptive mother. Reading the DUPA in gender neutral terms, the Family Court also explained that Gordon could not establish a parent-child relationship under section 8–201(b)(1), which provides that the father-child relationship may be established by "[a]n unrebutted presumption of the man's paternity of the child under § 8–204,"[31] because Gordon could not meet any of the criteria for establishing a presumption of paternity. Under section 8–204(a)(5), "A man is presumed to be the father of a child if ... [f]or the 1st 2 years of the child's life, he resided in the same household with the child and openly held out the child as his own."[32] The Family Court explained that Gordon failed to meet the requirements of section 8–204(a)(5) because, "even if the Court were to consider the first two years of A.N.S.'s life to be the first two years *after* her adoption rather than immediately following her birth, Gordon only lived in the same household with A.N.S. for approximately thirteen months, not the required two years."[33]

The Family Court's reading of section 8–204(a)(5) appears to be a reasonable, gender-neutral interpretation.[34] Therefore, had Gordon resided with A.N.S. for at least two years after the adoption and held A.N.S. out as her child during that time, she apparently would have been able to establish a *legal* parent-child relationship under sections 8–201(b)(1) and 8–

---

30. "An adjudication of a woman's maternity" in section 8–201 refers to rare situations where there is a "question of maternal descent." Unif. Parentage Act, Prefatory Note (1973) (amended 2002). Whether someone is the biological mother of the child is usually not disputed because the mother bears the child. *Id.* The 1973 UPA provided: "The parent and child relationship between a child and the natural mother may be established by proof of her having given birth to the child." Unif. Parentage Act § 3 (1973) (amended 2002).

31. Del.Code Ann. tit. 13, § 8–201.

32. Del.Code Ann. tit. 13, § 8–204(a)(5).

33. *Smith v. Gordon,* File No. CN04–08601, Pet. No. 04–20625, at 26, 2006 WL 5668820 (Del.Fam. Ct. June 27, 2006). The Family Court also noted that when the UPA was amended in 2002, the NCCUSL significantly amended section 4(4) of the 1973 UPA, which created a presumption of paternity if a man "receives the child into his home and openly holds out the child as his natural child." Unif. Parentage Act § 8–204, cmt. (2000) (amended 2002) (citing Unif. Parentage Act § 4(4) (1973)). The comment explains: "Because there was no time frame specified in the 1973 act, the language fostered uncertainty about whether the presumption could arise if the receipt of the child into the man's home occurred for a short time or took place long after the child's birth." *Id.* Therefore, the amended UPA preserved that "holding out" presumption "subject to an express durational requirement that the man reside with the child for the first two years of the child's life." *Id.*

34. We also note that under section 8–704 of the DUPA, a finding of a man's paternity is permitted when a woman has a child as a result of assisted reproduction and the woman and a man, who is not the biological or adoptive father of the child, "during the first 2 years of the child's life, resided together in the same household with the child and openly held out the child as their own." Del.Code Ann. tit. 13, § 8–704(b).

204(a)(5) of the DUPA regardless of her status as a *de facto* parent. However, the undisputed record reflects that Gordon only lived with A.N.S. for about thirteen months.

### De Facto Parent Status

The Family Court determined that the DUPA's requirement for a *"legal* relationship between a child and a parent of the child" was not the exclusive means of establishing a "parent-child relationship" for purposes of petitioning for custody under title 13, section 721(a) of the Delaware Code. It determined that *de facto* parent status was also a means of qualifying as a "parent" under section 721(a). The Family Court held that, for purposes of title 13, section 721(a), a "parent" includes not only a biological parent, an adoptive parent and a person who has established a *legal* parent-child relationship under the DUPA, but also a person who has established that he or she is a *de facto* parent.

The Family Court then applied the five-part test for establishing *de facto* parent status that the Family Court, in *In re Hart,* originally adopted from the Wisconsin Supreme Court.[35] In *Hart,* the Family Court held that *de facto* parent status is established if the *de facto* parent:

(1) has the support and consent of the parent who fostered the formation and establishment of a parent-like relationship with the child;

(2) has assumed the obligations of parenthood by taking significant responsibility for the child's care, education and development—including the child's support, without the expectation of financial compensation;

(3) has acted in a parental role for a length of time sufficient to have established a bonded and dependent relationship that is parental in nature;

(4) has helped to shape the child's daily routine by addressing developmental needs, disciplining the child, providing for the child's education and medical care and serving as a moral guide;

(5) has on a day to day basis, through interaction, companionship, interplay and mutuality, fulfilled the child's needs for a psychological adult who helped fulfill the child's needs to be loved, valued, appreciated and received as an essential person by the adult who cares for him or her.[36]

The Family Court also relied on *S.S. v. E.M.S.,*[37] which followed the reasoning of the New Jersey Supreme Court in *V.C. v. M.J.B.*[38] The New Jersey Supreme Court held that a psychological (*de facto*) parent is a parent for the purpose of petitioning for joint custody and visitation.[39] In *S.S.*

---

**35.** *In re Hart,* 806 A.2d 1179 (Del.Fam.Ct. 2001). The Family Court held that an unmarried person can adopt his or her partner's adoptive child in a "second-parent" adoption if that person qualifies as a *de facto* parent and has the consent of the adoptive parent. A "second-parent" adoption is similar to a "step-parent" adoption and does not affect the legal rights of the adoptive parent. The Family Court adopted the five-part test for determining whether someone qualifies as a *de facto* parent for purposes of consensual, "second-parent" adoption from the Wisconsin Supreme Court. *Id.* at 1187–88 (citing *In re Custody of H.S.H.-K.,* 193 Wis.2d 649, 533 N.W.2d 419, 435–36 (1995)).

**36.** *In re Hart,* 806 A.2d at 1187–88 (citing *In re H.S.H.-K.,* 193 Wis.2d 649, 533 N.W.2d 419, 435–36 (1995)).

**37.** *S.S. v. E.M.S.,* 2004 WL 3245935 (Del. Fam.Ct.).

**38.** *V.C. v. M.J.B.,* 163 N.J. 200, 748 A.2d 539 (2000).

**39.** *Id.* at 554. The New Jersey Supreme Court explained that "psychological parent" was the court's preferred term but noted that the court used the terms psychological parent, *de facto* parent, and functional parent interchangeably in the opinion "to reflect their use

*v. E.M.S.*, the Family Court concluded that "once the non-biological parent is determined to be a '*de facto*' parent, they stand in parity with the legal parent and have standing to petition [the Family] Court for custody of the children pursuant to [title 13, section 721]." [40] In this case, the Family Court concluded that Gordon qualified as a *de facto* parent. Therefore, it held that Gordon had standing as a parent to seek custody of A.N.S. under section 721(a).

### Uniform Parentage Act History

The National Conference of Commissioners on Uniform State Laws ("NCCUSL") promulgated the first version of the Uniform Parentage Act ("UPA") in 1973 following a law review article about the unequal legal treatment of illegitimate children for child support and inheritance purposes. [41] The UPA intended to identify "two legal parents for both marital and non-marital children," [42] and was mostly concerned with asserting the rights of children born out of wedlock in a civil paternity action against their fathers. [43] The Act also provided a right to

bring a maternity action in those rare cases where the identity of the biological mother might be disputed. [44]

In 1988, in response to the increasing use of assisted reproduction and surrogacy agreements, the NCCUSL promulgated the Uniform Status of Children of Assisted Conception Act ("USCACA") for establishing the legal parents of children born as a result of assisted reproduction. [45] The Uniform Putative and Unknown Fathers Act ("UPUFA") followed with procedures for identifying putative and unknown fathers and for terminating their parental rights. [46]

The UPA was revised in 2000. [47] The revised Act "continues to serve the purposes of the 1973 Uniform Parentage Act, particularly the purpose of identifying fathers so that child support obligations may be ordered." [48] It also incorporates the 1988 USCACA and UPUFA, [49] and takes account of new technology that makes it possible to identify a father by genetic testing. [50]

The UPA was amended further in 2002, [51] to address concerns that the 2000

in the various cases, statutes, and articles cited." *Id.* at 546 n. 3.

40. *S.S. v. E.M.S.*, 2004 WL 3245935, at *5 (Del.Fam.Ct.)

41. Unif. Parentage Act, Prefatory Note (1973) (amended 2002) (citing Harry D. Krause, *Bringing the Bastard into the Great Society—A Proposed Uniform Act on Legitimacy*, 44 Tex. L.Rev. 829 (1966)).

42. Mary Patricia Byrn, *From Right to Wrong: A Critique of the 2000 Uniform Parentage Act*, 16 U.C.L.A. Women's L.J. 163, 165 (2007). *See also* Unif. Parentage Act, Prefatory Note (1973) (explaining that the UPA aimed to provide "substantive legal equality for all children regardless of the marital status of their parents").

43. Unif. Parentage Act, Prefatory Note (1973) (amended 2002).

44. *Id.*

45. Unif. Parentage Act, Prefatory Note (2000) (amended 2002).

46. *Id.*

47. *Id.*

48. Uniform Law Commissioners, National Conference of Commissioners of Uniform State Laws, Summary—Uniform Parentage Act (Last Revised or Amended in 2002), http://www.nccusl.com/Update/uniformact_summaries/uniformacts-s-upa. asp.

49. *Id.*

50. *Id.*

51. Unif. Parentage Act, Prefatory Note (2000) (amended 2002). The 2000 UPA with the

revisions "did not adequately treat a child of unmarried parents equally with a child of married parents."[52] In the 2000 revisions, a husband who consented to his wife's assisted reproduction was the legal father of the resulting child, even though he was not the biological father.[53] A couple who intended to become the parents of a child born as a result of a surrogacy agreement had to be married.[54] In the 2002 amendments, "husband" and "wife" were changed to "man" and "woman" to account for unmarried couples and avoid treating children of unmarried parents differently.[55] Because of the wording, however, a child born to an unmarried same-sex couple as a result of assisted reproduction could not have two legal parents.[56]

2002 amendments are referred to collectively as the "revised UPA" unless indicated otherwise.

52. *Id.*

53. Unif. Parentage Act § 703 (2000). *See* Mary Patricia Byrn, *From Right to Wrong: A Critique of the 2000 Uniform Parentage Act*, 16 U.C.L.A. Women's L.J. at 170.

54. *See* Unif. Parentage Act § 801(b) (2000); Mary Patricia Byrn, *From Right to Wrong: A Critique of the 2000 Uniform Parentage Act*, 16 U.C.L.A. Women's L.J. at 170.

55. *See* Unif. Parentage Act §§ 703, 801(b) (2000) (amended 2002); Mary Patricia Byrn, *From Right to Wrong: A Critique of the 2000 Uniform Parentage Act*, 16 U.C.L.A. Women's L.J. at 170.

56. Mary Patricia Byrn, *From Right to Wrong: A Critique of the 2000 Uniform Parentage Act*, 16 U.C.L.A. Women's L.J. at 171. If a woman in a same-sex relationship gave birth to a child as a result of IVF with the intent of raising the child, she would be the child's legal mother. *Id.* at 171. Her partner, who might also intend to raise the child, would not be a parent under the revised UPA. *Id.* If two men intended to raise a child born via surrogate but neither had a biological relationship to the child, the revised UPA would not recognize them as parents either. *Id.* at

## ALI Parentage Principles

The requirements for establishing maternity and paternity under the American Law Institute ("ALI") are markedly different from the requirements for qualifying as a parent under the UPA.[57] Commentators consider the ALI Principles to provide the most expansive definition of parental rights.[58] The American Law Institute's Principles of the Law of Family Dissolution ("ALI Principles") define "parent" as a "legal parent," "parent by estoppel" or "*de facto* parent."[59]

All three types of "parents" have standing under the ALI Principles to seek "parenting time," i.e., custody.[60] A "legal parent" is someone who currently would be

171, 171 n. 30 (noting that one intended parent in that situation could be recognized as a legal parent if he or she had a biological relationship to the child).

57. Laura Nicole Althouse, *Three's Company? How American Law Can Recognize a Third Social Parent in Same–Sex Headed Families*, 19 Hastings Women's L.J. 171, 208 (2008).

58. *See* Laura Nicole Althouse, *Three's Company? How American Law Can Recognize a Third Social Parent in Same–Sex Headed Families*, 19 Hastings Women's L.J. 171, 208 (2008) (citing David D. Meyer, *Partners, Caregivers, and the Constitutional Substance of Parenthood, in* Reconceiving the Family: Critique on the American Law Institute's Principles of the Law of Family Dissolution 47, 64 (Robin Fretwell Wilson ed., Cambridge Univ. Press 2006)).

59. Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.03 (2000) (amended 2002).

60. Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.04. Rather than use the term "custody," the ALI uses the term "allocation of parental responsibility." Principles of the Law of Family Dissolution: Analysis and Recommendations, §§ 2.03, 2.04.

identified as a parent under state law.[61] A "parent by estoppel" is someone who has lived with the child and assumed full parental duties on a permanent basis with the legal parents' consent but is not otherwise recognized under existing law.[62] A "*de facto* parent" is someone who, for at least two years, has lived with the child and provided care and nurturance on an equal level with the legal parents, either with the legal parents' consent or in response to the legal parents' failure to act as parents to the child.[63]

The ALI explains that other individuals such as a stepparent or non-marital partner of the legal parent may function as a parent and be recognized as a *de facto* parent "under a strict set of criteria designed to test the individual's level of commitment and involvement in the child's life." [64] The ALI's requirements for a *de facto* parent are rigid "to avoid unnecessary and inappropriate intrusion into the relationships between legal parents and their children." [65] We note, however, that even under the expansive ALI standards, Gordon would not qualify as a *de facto*

parent because she did not live with A.N.S. for at least two years.

### UPA Omits De Facto Parent

The foregoing discussion reflects that the UPA provides a more narrow scope of who may be adjudicated a parent than does the ALI Principles. The ALI Principles were known when the UPA was amended in 2002. Nevertheless, the 2002 UPA does not recognize the status of *de facto* parent. It has been noted that, "[w]hile the UPA made some strides to address changing avenues to parentage, [for example, surrogate parenting and assisted reproduction], it inevitably did not contemplate nor address every conceivable family constellation" and fails to address directly *de facto* parenthood.[66]

A 2007 law review article also notes the UPA's omissions.[67] The author writes that the drafters of the revised UPA chose to leave a child born to a same-sex couple as a result of assisted reproduction with only one parent, "despite the fact that the same scientific, social, and legal arguments that convinced the [NCCUSL] to recognize

---

61. *See, e.g.,* Laura Nicole Althouse, *Three's Company? How American Law Can Recognize a Third Social Parent in Same–Sex Headed Families,* 19 Hastings Women's L.J. at 188 (citing Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.03(1)(a)).

62. *Id.* at 188 (citing Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.03(1)(b)).

63. Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.03(1)(c). A *de facto* parent is someone who: (1) lived with the child for a significant period of time not less than two years; (2) with the agreement of the legal parent; (3) primarily to form a parent-child relationship and not primarily for financial compensation, or as a result of a legal parent's complete failure to perform caretaking functions; and (4) regularly performed a majority of the care-

taking functions for the child or regularly performed a share of caretaking functions at least as great as that of the parent with whom the child primarily lived.

64. Principles of the Law of Family Dissolution: Analysis and Recommendations, Summary Overview of Chapter 2–7, § II(g) (2002) (citing Principles of the Law of Family Dissolution: Analysis and Recommendations, § 2.03(1)(c)).

65. Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.03 cmt.c.

66. *In re Parentage of L.B.,* 155 Wash.2d 679, 122 P.3d 161, 166 n. 5 (2005) (citations omitted).

67. Mary Patricia Byrn, *From Right to Wrong: A Critique of the 2000 Uniform Parentage Act,* 16 U.C.L.A. Women's L.J. 163 (2007).

both parents of non-marital children in the 1973 UPA existed in support of recognizing both parents of children conceived through [assisted reproduction] and born to same-sex couples in the [revised] UPA."[68] Similarly, as we already noted, a child adopted by only one partner in a same-sex relationship has only one parent under the UPA even if both partners function as her parents. The UPA has developed without same-sex couples in mind.[69]

### Delaware's Parentage Act History

The Delaware General Assembly enacted the DUPA in 1983.[70] It was adopted from the 1973 UPA.[71] In 1992, the Delaware Supreme Court held that the DUPA was not the exclusive way to determine paternity.[72] This Court explained in *Blake v. Myrks* that the DUPA was ambiguous and inconsistent as to whether it was intended to be exclusive.[73] One section of the 1983 DUPA provided that the parent-child relationship between a child and his or her natural father *"may* be established in accordance with this chapter,"[74] which suggested the DUPA was not exclusive.[75] Another section suggested that the DUPA was exclusive.[76] It provided that a court order as to whether a parent-child relationship exists *"is determinative for all purposes."*[77] In *Blake,* this Court concluded: "In the absence of clear language to the contrary, this Court will not interpret the [DUPA] as revoking the Family Court's ability to determine paternity in accordance with procedures established before the statute's enactment."[78]

In 2004, the Delaware General Assembly repealed the 1983 DUPA[79] and enacted a new statute to reflect the 2000 revisions and 2002 amendments to the UPA.[80] The new DUPA superseded the prior statute. It also superseded the *Blake* case which interpreted the prior statute as nonexclusive.[81] The 2004 DUPA unambiguously

**68.** *Id.* at 166.

**69.** *See, e.g.,* Nicole L. Parness, Note and Comment: *Forcing a Square into a Circle: Why are Courts Straining to Apply the Uniform Parentage Act to Gay Couples and their Children,* 27 Whittier L.Rev. 893 (2006) (arguing that it is inequitable to apply the Uniform Parentage Act to gay and lesbian couples because it was developed without them in mind and advocating for the development of new legislation to track societal changes).

**70.** H.B. 139, 142nd Gen. Assem., Reg. Sess. (Del.2003).

**71.** *Id.*

**72.** *Div. of Child Support Enforcement ex rel. Blake v. Myrks,* 606 A.2d 748, 751 (Del.1992).

**73.** *Id.*

**74.** Del.Code Ann. tit. 13, § 803(2) (repealed 2004) (emphasis added).

**75.** *Blake v. Myrks,* 606 A.2d at 750.

**76.** *Id.* at 751.

**77.** Del.Code Ann. tit. 13, § 812(a) (repealed 2004) (emphasis added).

**78.** *Blake v. Myrks,* 606 A.2d at 751 n. 3.

**79.** *See* Del.Code Ann. tit. 13, §§ 801–819 (repealed 2004).

**80.** Del.Code Ann. tit. 13, §§ 8–101–8–904 (enacted 2004); H.B. 139, 142nd Gen. Assem., Reg. Sess. (Del.2003).

**81.** *See Wilson v. State,* 305 A.2d 312, 317 (Del.1973) ("Delaware follows the common law except when changed by statute."); *Baker v. Smith & Wesson Corp.,* 2002 WL 31741522, at *4 (Del.Super.) (explaining that the common law remains in force unless the legislature or courts say otherwise and stating that "it is axiomatic that absent a statute to the contrary, the court may adopt common law doctrines covering legal issues it must decide"). *See also Beattie v. Beattie,* 630 A.2d 1096, 1097 (Del.1993) ("It is well settled that the judiciary has the power to overturn judicially-created doctrine, so long as that doctrine has not been codified in a statute.") (citing *Duvall v. Charles Connell Roofing,* 564

provides that it "applies to determination of parentage in this state."[82]

### Other Jurisdictions

Several jurisdictions have statutes that courts have interpreted to permit *de facto* parents to petition for custody, visitation, an allocation of parental rights or similar orders.[83] In states where statutes have not specifically recognized *de facto* parents, some courts have found that individuals with the status of *de facto* parent, or other similar status, have standing to petition for child custody or visitation, or have child support obligations.[84] For example, in *V.C. v. M.J.B.*, the New Jersey Supreme Court recognized a psychological (*de facto*) parent as a "parent" with standing to petition for custody or visitation, but not joint custody under the facts of that case.[85]

In one state, Washington, which adopted the revised UPA, its highest court recognized the status of *de facto* parent under the common law as a means of determining parentage, in addition to, and apart from, the UPA as adopted by that state.[86] The Washington Supreme Court concluded that, although Washington's version of the UPA "fails to contemplate all potential scenarios which may arise in the ever-changing and evolving notion of familial rela-

A.2d 1132 (Del.1989); *Travelers Indem. Co. v. Lake*, 594 A.2d 38 (Del.1991)).

82. Del.Code Ann. tit. 13, § 8–103 (2008).

83. *In re Parentage of L.B.*, 155 Wash.2d 679, 122 P.3d 161 (2005); *In re Clifford K.*, 217 W.Va. 625, 619 S.E.2d 138 (2005); *Elisa B. v. Superior Court*, 37 Cal.4th 108, 33 Cal.Rptr.3d 46, 117 P.3d 660 (2005); *C.E. W. v. D.E. W.*, 845 A.2d 1146 (Me.2004); *Riepe v. Riepe*, 208 Ariz. 90, 91 P.3d 312 (Ct.App.2004); *In re E.L.M.C.*, 100 P.3d 546 (Colo.Ct.App.2004); *Rubano v. DiCenzo*, 759 A.2d 959 (R.I.2000); *In re LaChapelle v. Mitten*, 607 N.W.2d 151 (Minn.Ct.App.2000); *E.N.O. v. L.M.M.*, 429 Mass. 824, 711 N.E.2d 886 (1999); *Laspina–Williams v. Laspina–Williams*, 46 Conn.Supp. 165, 742 A.2d 840 (1999); *Jones v. Fowler*, 969 S.W.2d 429 (Tex.1998).

84. See *In re Parentage of A.B.*, 837 N.E.2d 965 (Ind.2005); *T.B. v. L.R.M.*, 567 Pa. 222, 786 A.2d 913 (2001) (recognizing the status of *in loco parentis*); *V.C. v. M.J.B.*, 163 N.J. 200, 748 A.2d 539 (2000) (recognizing the status of "psychological parent"); *In re T.L.*, 1996 WL 393521 (Mo.Cir. May 7, 1996) (adopting the doctrine of "equitable parent"); *In re Custody of H.S.H.-K.*, 193 Wis.2d 649, 533 N.W.2d 419 (1995) (permitting a person in a "parent-like" relationship with the child to petition for visitation); *Carter v. Brodrick*, 644 P.2d 850 (Alaska 1982) (permitting a non-parent with status of a psychological parent or *in loco parentis* to petition for custody). *But see Wakeman v. Dixon*, 921 So.2d 669 (Dist.Ct.App.Fla.2006); *In re Thompson*, 11 S.W.3d 913 (Tenn.Ct.App.

1999); *In re Visitation with C.B.L.*, 309 Ill. App.3d 888, 243 Ill.Dec. 284, 723 N.E.2d 316 (1999); *Titchenal v. Dexter*, 166 Vt. 373, 693 A.2d 682 (1997); *McGuffin v. Overton*, 214 Mich.App. 95, 542 N.W.2d 288 (1995); *Alison D. v. Virginia M.*, 77 N.Y.2d 651, 569 N.Y.S.2d 586, 572 N.E.2d 27 (1991).

85. *V.C. v. M.J.B.*, 163 N.J. 200, 748 A.2d 539 (2000).

86. *In re Parentage of L.B.*, 122 P.3d at 173–75. Other state supreme courts that had recognized *de facto* parent or other similar status under the common law as of 2003 when the Delaware General Assembly adopted the revised UPA include: Wisconsin, *In re Custody of H.S.H.-K.*, 193 Wis.2d 649, 533 N.W.2d 419 (1995) (holding that person in "parent-like" relationship with child may petition for visitation); Massachusetts, *E.N.O. v. L.M.M.*, 429 Mass. 824, 711 N.E.2d 886 (1999), *cert. denied*, 528 U.S. 1005, 120 S.Ct. 500, 145 L.Ed.2d 386; Pennsylvania, *T.B. v. L.R.M.*, 567 Pa. 222, 786 A.2d 913 (2001) (recognizing same-sex partner had status of *in loco parentis* and was entitled to seek shared custody of child with partner who was biological mother); New Jersey, *V.C. v. M.J.B.*, 163 N.J. 200, 748 A.2d 539 (2000) (permitting woman to petition for visitation as "psychological parent" of her former same-sex partner's biological children), *cert. denied*, 531 U.S. 926, 121 S.Ct. 302, 148 L.Ed.2d 243; Rhode Island, *Rubano v. DiCenzo*, 759 A.2d 959 (R.I.2000) (permitting *de facto* parent to petition for visitation).

tions," the statute's "fail[ure] to speak to a specific situation" did not preclude "the availability of potential redress" under the common law.[87] In reaching that conclusion, the Washington Supreme Court stated:

> Reason and common sense support recognizing the existence of *de facto* parents and according them the rights and responsibilities which attach to parents in this state. We adapt our common law today to fill the interstices that our current legislative enactment fails to cover in a manner consistent with our laws and stated legislative policy.

\* \* \*

> We thus hold that henceforth in Washington, a *de facto* parent stands in legal parity with an otherwise legal parent, whether biological, adoptive, or otherwise. As such, recognition of a person as a child's *de facto* parent necessarily "authorizes [a] court to consider an award of parental rights and responsibilities ... based on its determination of the best interest of the child."[88]

### Judicial Deference To Legislative Policy

Family relationships in Delaware are highly regulated by statute. Title 13 of the Delaware Code, entitled "Domestic Relations," governs, among other things, marriage, divorce, domestic violence, child custody, child support, and adoption.[89] The DUPA, which is also part of title 13, was adopted from the UPA.[90]

Section 8–103 explains the scope of the DUPA. Subsection (a) provides unambiguously that the DUPA "applies to determinations of parentage in this State."[91] Although the DUPA "does not create, enlarge, or diminish parental rights or duties under other law of this State,"[92] the DUPA, like the revised UPA, does not include the *de facto* parent doctrine.

The *de facto* parent doctrine was known in 2004 when the General Assembly enacted the new DUPA not only because the ALI Principles were extant, but, also because the Family Court had embraced the doctrine in the child adoption context.[93] Nevertheless, the General Assembly did not include or recognize the doctrine in the new statute. Instead, the DUPA unambiguously defines the "parent-child relationship" as "the *legal* relationship between a child and the parent of the child."[94]

■ The Delaware General Assembly adopted detailed legislation that does not include *de facto* parent in the definition of parent.[95] The Delaware General Assembly's declination to include a *de facto* par-

---

87. *In re Parentage of L.B.*, 122 P.3d at 176.

88. *Id.* at 176–77 (citations omitted).

89. Del.Code Ann. tit. 13, §§ 101–2372 (2008).

90. H.B. 139, 142nd Gen. Assem., Reg. Sess. (Del.2003).

91. Del.Code Ann. tit. 13, § 8–103(a) (2008).

92. Del.Code Ann. tit. 13, § 8–103(c).

93. *In re Hart*, 806 A.2d 1179, 1187–89 (Del. Fam.Ct.2001) (holding that an unmarried person can adopt his or her partner's adopted child in a "second-parent" adoption if he or she meets the *de facto* parent test and has the consent of the adoptive parent) (citing *In re H.S.H.-K.*, 193 Wis.2d 649, 533 N.W.2d 419, 435–46 (1995)).

94. Del.Code Ann. tit. 13, § 8–102(13) (emphasis added).

95. *Cf.* Minn.Stat. § 257C.08, subd. 4 (2008) (permitting someone other than the legal parent to petition for visitation over the objections of the legal parent if: (1) the petitioner lived with the child for two years or more; (2) the petitioner and child developed emotional ties creating a parent and child relationship; (3) it is in the best interests of the child to

ent in any Delaware statute was not inadvertent. The Delaware judiciary cannot now independently confer upon a *de facto* parent the same status as a *legal* parent either as a matter of statutory construction or common law.[96] Where the General Assembly enacts a comprehensive statutory scheme that reflects a public policy unambiguously to define the parent-child relationship as a *legal* relationship, any modifications in that policy must be made by the legislature.[97]

For example, if *de facto* parent status is recognized by statute, the General Assem-

bly would decide, *inter alia,* whether the *de facto* parent must reside with the child for "a significant period of time not less than two years" [98] or "for a length of time sufficient to have established a bonded and dependent relationship that is parental in nature." [99] At least two other provisions in the DUPA require a person seeking to establish a parent-child relationship to have resided with the child for at least *two years* and to have held out the child as his or her own during that time: section 8–204(a)(5) [100] and section 8–704(b).[101] Therefore, if *de facto* parent were recog-

grant visitation; and (4) visitation rights would not interfere with the relationship between the custodial parent and the child); *SooHoo v. Johnson,* 731 N.W.2d 815 (Minn. 2007) (holding that the portion of the Minnesota statute permitting a third party to petition for custody is constitutional and affirming the trial court's grant of visitation to a third party who stood *in loco parentis* to the children over the objections of the children's adoptive mother).

**96.** *See, e.g., Cline v. Prowler Indus.,* 418 A.2d 968, 974, 980 (Del.1980) (holding that the General Assembly's decision to adopt the warranty provisions of Article 2 of the Uniform Commercial Code ("UCC") pre-empted the application of strict products liability under the common law and noting that this Court "would be engaging in impermissible judicial legislation" if it were to find that the UCC did not preempt strict tort liability).

**97.** When the General Assembly enacts controlling legislation, changes in well-settled public policy must be effected by the General Assembly. *Beattie v. Beattie,* 630 A.2d 1096, 1098 (Del.1993) (citing *Saunders v. Hill,* 202 A.2d 807, 810 (Del.1964)) ("If a change is to be effected in the well-settled public policy of this State, such change must be effected by the Legislature and not by this court.") (citing *Ennis v. Donovan,* 222 Md. 536, 161 A.2d 698 (1960)). *See, e.g., Wright v. Moffitt,* 437 A.2d 554, 555–56 (Del.1981) (declining to create a common law cause of action for Dram Shop liability because such action was in the power and responsibility of the General Assembly because "the General Assembly is in a far better position than this Court to gather the

empirical data and to make the fact finding necessary to determine what the public policy should be"). *See also Shea v. Matassa,* 918 A.2d 1090, 1095–96 (Del.2007) (declining to create a new cause of action and deferring to the General Assembly as the proper forum to seek a change in the law regarding Dram Shop liability); *Whalen v. On–Deck, Inc.,* 514 A.2d 1072, 1073–74 (Del.1986) (holding that this Court would defer to the General Assembly as the proper forum to seek a change in law).

**98.** Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.03(1)(c) (2000) (amended 2002).

**99.** *In re Hart,* 806 A.2d 1179, 1187 (Del.Fam. Ct.2001).

**100.** Del.Code Ann. tit. 13, § 8–204(a)(5) ("A man is presumed to be the father of a child if ... [f]or the 1st 2 years of the child's life, he resided in the same household with the child and openly held out the child as his own.").

**101.** Del.Code Ann. tit. 13, § 8–704(b). Section 8–704 provides: "Consent to assisted reproduction"

(a) Consent by a woman and a man who intends to be a parent of a child born to a woman by assisted reproduction must be in a record signed by the woman and the man. This requirement does not apply to a donor.

(b) Failure to sign a consent required by subsection (a) of this section, before or after birth of the child, does not pre-

nized by statute, it seems that the General Assembly would be more likely to enact the two-year ALI approach than to follow the *de facto* parent bonding test adopted by the Family Court in *In re Hart* and applied in this case to a thirteen-month relationship.

### Gordon Lacks Standing

Title 13, section 721 of the Delaware Code distinguishes between parents and an "other person."[102] Those distinctions governing who can petition for custody reflect the policy of protecting legal parents from the intrusions of third parties. Even the ALI Principles recognize the need for such limitations, and acknowledge that "[t]he requirements for becoming a *de facto* parent are strict, to avoid unnecessary and inappropriate intrusion into the relationship between legal parents and their children."[103]

■ A person who does not qualify as a legal parent has no standing to petition for custody of a child unless the child is dependent or neglected and a consideration of the best interests of the child lead the Family Court to determine that the child should not be placed in the custody of the legal parent.[104] Gordon is not a legal parent, nor can she establish that A.N.S. is dependent or neglected and that it would

be in A.N.S.'s best interests not to place A.N.S. in the custody of her adoptive mother. Therefore, we hold that Gordon does not have standing to seek custody under section 721(a).[105]

### Conclusion

This case involved a dispute between unmarried same-sex former partners. The issues presented in this appeal are not limited to unmarried same-sex partners and could arise in a variety of other circumstances.[106] Providing relief in such situations, however, is a public policy decision for the General Assembly to make.

The judgments of the Family Court are reversed. This matter is remanded for further proceedings in accordance with this opinion.

---

clude a finding of paternity if the woman and man, during the first 2 years of the child's life, resided together in the same household with the child and openly held out the child as their own.

**102.** Del.Code Ann. tit. 13, § 721.

**103.** Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.03 cmt.c. (2000) (amended 2002). *See* Mary Patricia Byrn, *From Right to Wrong: A Critique of the 2000 Uniform Parentage Act,* 16 U.C.L.A. Women's L.J. 163, 194 (2007); David D. Meyer, *Parenthood in a Time of Transition: Tensions Between Legal, Biologi-*

*cal, and Social Conceptions of Parenthood,* 54 Am. J. Comp. L. 125, 135 (2006).

**104.** Del.Code Ann. tit. 13, § 721(e).

**105.** *See Janice M. v. Margaret K.,* 404 Md. 661, 948 A.2d 73 (2008) (declining to recognize *de facto* parent as a legal status in Maryland and holding that in order for the court to grant visitation for former same-sex partner, it must find that the mother was an unfit parent or that exceptional circumstances existed).

**106.** *Janice M. v. Margaret K.,* 948 A.2d at 87–88.